The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GERALD JACKSON, ROSLYN JACKSON, DEAN MELLOM, JON PERRIN AND JULIE PERRIN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE ALIERA COMPANIES, INC., a Delaware corporation; ALIERA HEALTHCARE, INC., a Delaware corporation; TRINITY HEALTHSHARE, INC., a Delaware corporation,

Defendants.

NO. 2:19-cv-01281-BJR

**DECLARATION OF ELEANOR HAMBURGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: INSURANCE**

I, Eleanor Hamburger, declare under penalty of perjury and in accordance with the laws of the State of Washington and the United States that:

1.     I am a partner at Sirianni Youtz Spoonemore Hamburger PLLC and am one of Plaintiffs' Counsel and Proposed Class Counsel in this action.

2.     I submitted multiple public records requests to the Washington Office of the Insurance Commissioner ("OIC") regarding Aliera Healthcare, The Aliera Companies (collectively "Aliera") and Trinity Healthshare ("Trinity"). One of the requests sought

DECLARATION OF ELEANOR HAMBURGER – 1
[Case No. 2:19-cv-01281-BJR]

copies of the consumer complaints submitted to the OIC regarding Aliera and/or Trinity. Over two dozen complaint files were provided as a result of my request. I also received *Exhibits A* and *B* pursuant to my public records requests.

3. Attached are true and correct copies of the following documents:

| Exhibit | Description | Date |
|---|---|---|
| *A* | Certification of Authenticity by the Secretary of State of the State of Delaware of the Certificate of Incorporation of Aliera Healthcare, Inc. filed 12-18-2015 (TDI_001957-1959) | 04-08-2019 |
| *B* | Certification of Authenticity by the Secretary of State of the State of Delaware of the Amended and Restated Certificate of Incorporation of Aliera Healthcare, Inc. filed 06-08-2017 (TDI_001954-1956) | 04-08-2019 |
| *C* | Web article titled "Trinity Healthshare Announces Agreement-with Faith-Driven Life Church," accessed 07-01-2020 at https://www.trinityhealthshare.org/2020/01/trinity-healthshare-announces-agreement-with-faith-driven-life-church/ | 01-29-2020 |
| *D* | Aliera Healthcare's Explanation of Benefits to Dean Mellom (ALIERA_JKS 000859-59) | 04-27-2019 |
| *E* | Certification of Enrollment Engrossed Substitute Senate Bill 5122, Chapter 314, Laws of 2011, 62nd Legislature, 2011 Regular Session, Insurance Coverage – Affordable Care Act Implementation, effective date: 07/22/11 - except sections 10 through 12, which become effective 01/01/12 | 05-11-2011 |
| *F* | Final Bill Report ESSB 5122 | 07-22-2011 |
| *G* | House Bill Report ESSB 5122 | 04-09-2011 |
| *H* | Samaritan Ministries, et al., Order to Cease and Desist issued by the State of Washington Office of Insurance Commissioner, No. 11-0075 | 04-01-2011 |

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

| Exhibit | Description | Date |
|---------|-------------|------|
| *I* | Alliance for Shared Health Order to Cease and Desist issued by the State of Washington Office of Insurance Commissioner, No. 20-0335 | 04-22-2020 |
| *J* | OneShare Health, LLC, Order to Cease and Desist issued by the State of Washington Office of Insurance Commissioner, No. 20-0250 | 03-31-2020 |

DATED:  September 3, 2020, at Seattle, Washington.

<div style="text-align:right">

*/s/ Eleanor Hamburger*
Eleanor Hamburger (WSBA #36478)
Sirianni Youtz Spoonemore Hamburger pllc
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303
Email:  ehamburger@sylaw.com
Attorneys for Plaintiffs

</div>

DECLARATION OF ELEANOR HAMBURGER – 3
[Case No. 2:19-cv-01281-BJR]

Sirianni Youtz
Spoonemore Hamburger pllc
3101 Western Avenue, Suite 350
Seattle, Washington  98121
Tel. (206) 223-0303  Fax (206) 223-0246

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

- **Jay Angoff**
  jangoff@findjustice.com
- **Ronan Patrick Doherty**
  doherty@bmelaw.com, christensen@bmelaw.com
- **Eleanor Hamburger**
  ehamburger@sylaw.com, matt@sylaw.com, stacy@sylaw.com, theresa@sylaw.com
- **Curt Roy Hineline**
  chineline@bakerlaw.com, jhickman@bakerlaw.com
- **Richard L. Jolly**
  rjolly@susmangodfrey.com, eball@susmangodfrey.com
- **Samantha Lin**
  slin@myers-company.com
- **Cyrus Mehri**
  cmehri@findjustice.com, pleadings@findjustice.com
- **James Raymond Morrison**
  jmorrison@bakerlaw.com, jhickman@bakerlaw.com
- **Michael David Myers**
  mmyers@myers-company.com, slin@myers-company.com, tpak@myers-company.com
- **Robert H. Rutherford**
  robert.rutherford@burr.com
- **Edgar Guy Sargent**
  esargent@susmangodfrey.com, ecf-4811d219bf44@ecf.pacerpro.com, paris-jimenez-2434@ecf.pacerpro.com, pjimenez@susmangodfrey.com, ecf-226e044d1c76@ecf.pacerpro.com
- **Elizabeth B. Shirley**
  bshirley@burr.com
- **Richard E. Spoonemore**
  rspoonemore@sylaw.com, matt@sylaw.com, rspoonemore@hotmail.com, stacy@sylaw.com, theresa@sylaw.com
- **Genevieve Vose Wallace**
  gwallace@susmangodfrey.com, jgrounds@susmangodfrey.com, genevieve-wallace-4415@ecf.pacerpro.com, ecf-009165bc539e@ecf.pacerpro.com

DATED: September 3, 2020, at Seattle, Washington.

_/s/ Eleanor Hamburger_
Eleanor Hamburger (WSBA # 26478)
Email: ehamburger@sylaw.com

DECLARATION OF ELEANOR HAMBURGER – 4
[Case No. 2:19-cv-01281-BJR]

**Exhibit A**

# Delaware



### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "ALIERA HEALTHCARE, INC.", FILED IN THIS OFFICE ON THE EIGHTEENTH DAY OF DECEMBER, A.D. 2015, AT 2:10 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

5911418  8100
SR# 20192508840

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202595776
Date: 04-08-19

OIC 7296 hamburger 355

TDI 001957

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:10 PM 12/18/2015
FILED 02:10 PM 12/18/2015
SR 20151437643 - File Number 5911418

# STATE of DELAWARE
# Certificate of Incorporation
# ALIERA HEALTHCARE, INC.
# A Stock Corporation

### ONE

Name of the corporation is Aliera Healthcare, Inc.

### TWO

The initial registered agent for the corporation shall be Delaware Business Incorporators, Inc., whose office address is 3422 Old Capitol Trail, Suite 700, Wilmington, New Castle County, Delaware, 19808, the registered agent in charge is Delaware Business Incorporators, Inc.

### THREE

The Board of Directors shall initially consist of two members and shall not exceed nine members, the names and address of the initial member of the Board of Directors is as follows:

Shelley Steele
(Incorporator)
700 River knoll Drive
Marietta, Georgia 30067

G. Michael Smith, Esq.
8565 Dunwoody Place
Building # 15
Atlanta, Georgia 30350

### FOUR

The Corporation is authorized to issue Fifty Million (50,000,000) Shares, of common, voting stock, 0.001 par value.

### FIVE

The Corporation is incorporated to engage in all legal forms of business as contemplated under the General Corporation Law of Delaware, to include but not to be limited by the following expressed purposes, to wit:

(a) To engage in the business of providing all models of Health Care to the general public. To use all forms of marketing to include all forms of print, television, radio, electronic media direct mailing to sell or advise of the business interests of the corporation.

(b) To cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders, and it shall be authorized in connection therewith to carry on any lawful business, not inconsistent with the General Corporation Law of Delaware, and is organized to follow the corporate powers conferred by the General Corporation Law of Delaware or any other applicable State or Federal Codes.

IN WITNESS WHEREOF, the undersigned for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this certificate, and do certify that the facts herein stated are true and I have accordingly hereunto set my hand this 18th day of December, A.D. 2015.

Shelley Steele
Incorporator

G. Michael Smith
Attorney for Incorporator

Exhibit B



# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE RESTATED CERTIFICATE OF "ALIERA HEALTHCARE, INC.", FILED IN THIS OFFICE ON THE EIGHTH DAY OF JUNE, A.D. 2017, AT 1:33 O`CLOCK P.M.





Jeffrey W. Bullock, Secretary of State

5911418  8100
SR# 20192508840

Authentication: 202595775
Date: 04-08-19

OIC 7296 hamburger 3552

TDI 001954

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:33 PM 06/08/2017
FILED 01:33 PM 06/08/2017
SR 20174656103 - File Number 5911418

# AMENDED AND RESTATED
# CERTIFICATE OF INCORPORATION
# OF
# ALIERA HEALTHCARE, INC.

Aliera Healthcare, Inc. (the "Corporation"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

FIRST: The name of the Corporation is Aliera Healthcare, Inc. The Corporation was incorporated on December 18, 2015.

SECOND: This Amended and Restated Certificate of Incorporation of the Corporation amends and restates the Certificate of Incorporation of the Corporation, and has been adopted and approved in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "General Corporation Law"). This Amended and Restated Certificate of Incorporation therefore supersedes the Certificate of Incorporation and Certificate of Amendment previously filed with the Delaware Secretary of State on December 18, 2015. This Amended and Restated Certificate of Incorporation was adopted by the Board of Directors and the stockholders of the Corporation in accordance with Section 242 of the General Corporation Law.

THIRD: The entire text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

## ARTICLE I

The name of the corporation (hereinafter called "Corporation") is Aliera Healthcare, Inc.

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is: Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose for which the Corporation is formed is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

## ARTICLE IV

The Corporation is authorized to issue two classes of stock to be designated, respectively, common stock and preferred stock. The total number of shares of all classes of capital stock ("Shares") which the Corporation shall have the authority to issue is 50,000, consisting of 40,000 Shares of common stock having a par value of $0.001 per share (the "Common Stock"), and 10,000 Shares of preferred stock having a par value of $0.001 per share (the "Preferred Stock"). The Board of Directors is authorized, subject to limitations prescribed by law, to provide for the issuance of shares of preferred stock in one or more series, and by filing a certificate pursuant to

29774849 v3

the applicable law of the State of Delaware, to establish from time to time the number of shares to be included in each such series, to fix the designation, powers, preferences, and rights of the shares of each such series and the qualifications, limitations, or restrictions of any wholly unissued series of preferred stock and to establish from time to time the number of shares constituting any such series or any of them; and to increase or decrease the number of shares of any series subsequent to the issuance of shares of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any series shall be decreased in accordance with the foregoing sentence, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution originally fixing the number of shares of such series.

## ARTICLE V

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The number of directors shall be fixed by or in the manner provided in the Bylaws. Any director, or the entire Board of Directors, may be removed, with or without cause, by the holders of a majority of shares of stock then entitled to vote in the election of directors.

## ARTICLE VI

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of the General Corporation Law; or (iv) for any transaction from which the director derived any improper personal benefit. Neither the repeal or the modification of this Article VII nor the adoption of any provisions of the Certificate of Incorporation of the Corporation inconsistent with this Article VII shall adversely affect the rights of any director of the Corporation with respect to any matter occurring, or any cause of action, suit or claim that, but for this Article VII, would accrue or arise, prior to such repeal, modification or adoption of an inconsistent provision.

## ARTICLE VII

The Certificate of Incorporation of the Corporation may be amended from time to time in accordance with the laws of the State of Delaware then in effect.

I, the undersigned, being the incorporator hereinabove named, for the purpose of forming a corporation pursuant to the General Corporation Law, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 27 day of June, 2017.

_____
Shelley Steele, Authorized Officer

OIC 7296 hamburger 35

TDI 001956

Exhibit C

Important Information Regarding Trinity HealthShare and Coronavirus (COVID-19)   **LEARN MORE**

Total Share Requests Paid: $61,782,246   |   Total Charitable Giving: $535,925      Apply Now    Members

Sharebox



About ⌄    Individual & Family ⌄    Resources ⌄    Member Guides    News

Contact Us



January 29, 2020

ATLANTA–Trinity HealthShare, a 501(c)(3) non-profit health care sharing ministry, is proud to announce its agreement with Faith Driven Life Church, a Church of God in Christ church located in East Point, Ga. The church has been proudly helping its members share their medical expenses since 1997, and through this relationship, Trinity aims to continue this tradition of sharing for the benefit of its collective membership.

Search…       SEARCH

## Recent Posts

### 3 Healthy and Refreshing Summer Drink Recipes

June 29. 2020

BECOME A MEMBER (855) 830-5766

we minister to families with medical bills by connecting them with other families to help pay these bills voluntarily with

Staying at Home
May 28, 2020

How Your Pet Can Positively Impact Your Health

gifts," said Joe Guarino, president of Trinity HealthShare. "We are grateful and excited about having a relationship with a








Cultivating Gratitude
April 22, 2020

not an insurance company, but instead a ministry helping likeminded people voluntarily share their medical expenses."

In 2019, Trinity's members shared in the cost of nearly $58 million in medical bills.

**About Trinity HealthShare**

Trinity HealthShare is a 501(c)(3) non-profit health care sharing ministry built on the centuries-old Christian tradition of sharing and bearing one another's health care needs. Our members hold a common set of ethical and religious beliefs, and voluntarily agree to share their medical expenses in accordance with those beliefs. Trinity guides cost sharing of member contributions for certain eligible health care needs. Trinity uses innovative technologies to streamline access to individual and family-focused health care services at each step along the care continuum. Our sharing programs are designed to simplify the complexities of health care, while putting the power of choice back in the hands of our members, 24/7, 365 days/year. For more information, visit trinityhealthshare.org.

**Contacts**

Joe Guarino, President
Trinity Healthshare, Inc.
844-803-8051
media@trinityhealthshare.org

BECOME A MEMBER (855) 830-5766



Information                              Cost-Sharing Programs



About ⌄     Individual & Family ⌄     Resources ⌄     Member Guides     News

Contact Us

PRIVACY POLICY • TERMS OF USE

© 2020 TRINITY HEALTHSHARE, INC. ALL RIGHTS
RESERVED.

BECOME A MEMBER (855) 830-5766

Exhibit D

Aliera Healthcare
5901-B PEACHTREE DUNWOODY RD STE B200
ATLANTA GA 30328-7149



## Explanation of Benefits
### THIS IS NOT A BILL

DEAN D MELLOM
STANWOOD WA

### Your Member Information
**Name:** DEAN D MELLOM
**EOB Date:** 04/27/2019
**ID No:**
**Group ID:** AHTRC
**Group Name:** ALIERA HEALTHCARE TRINITY COMBIN

### Contact Us
**Phone:** 1.844.834.3456
**Web Address:** www.alierahealthcare.com
**Hours:** 9AM - 6PM EST

### Recent Claim Activity

The information below is a summary of your health care claims, including any MSRA or non-covered amounts that you may owe the provider(s). Please review the detailed claim breakdown carefully. Some claims may require more information from you or your provider before they can be processed. You also should compare this summary to any health care bills you may receive.

| | | |
|---|---|---|
| **Total Charge** | $774.00 | This is the amount billed by the provider for health care services. |
| **Reduction Amount** | $77.40 | This is the amount saved using available pricing programs and network arrangements provided by your Claims Administrator. These dollars are not your responsibility. |
| **Plan Pay Amount** | $0.00 | This is the amount the Plan paid for billed services. |
| **Member Shared Responsibility** | $696.60 | This is the amount you may be billed by the provider after reductions or discounts, and after Plan benefits have been applied. |

**Patient:** DEAN D MELLOM       **Claim #:** AHL606666       **Provider:** SKAGIT VALLEY HOSPITAL

| Dates of Service | Service Description | Rmk Code* | Total Charge | Reduction Amount | Amount Excluded | Consult Fee | MSRA | Co-Expense | Paid At % | Plan Pay Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/28-02/28/2019 | Professional Service | 13 P1450 | $774.00 | $77.40 | $0.00 | $0.00 | $696.60 | $0.00 | | $0.00 |
| **Member Shared Responsibility:** | | $696.60 | **Totals:** $774.00 | $77.40 | $0.00 | $0.00 | $696.60 | $0.00 | | $0.00 |

### Reason Code Description

| Code | Description |
|---|---|
| 13 | TO MEMBER AND PROVIDER: This statement represents an adjustment of a previously processed charge. |
| P1450 | Paid in accordance with the PHCS discount rate agreement. |

### Year to Date Totals
**Plan Year: 2018**

| | | | |
|---|---|---|---|
| Individual In Network COEXPENSE | **Member:** DEAN | **Used:** $0.00 |
| Individual In Network CONSULT FEE | **Member:** DEAN | **Used:** $0.00 |
| Individual In Network MSRA | **Member:** DEAN | **Used:** $5,222.77 |
| Individual Out of Network COEXPENSE | **Member:** DEAN | **Used:** $0.00 |
| Individual Out of Network MSRA | **Member:** DEAN | **Used:** $0.00 |

CONFIDENTIAL                                                                 ALIERA_JKSN000858

**Important Information About Your Appeals Rights**

In addition to any consult fee, coinsurance and/or co-expense amounts, Member Responsibility may include all or a portion of any amount listed as Not Covered based on the remark codes. Acceptance of the amount paid is a full and final payment and member is not to be balanced billed.

Fraud Warning: Any person who, with intent to defraud, or knowing that they are facilitating a fraud against an insurer or payor submits an application or files a claim containing a false or deceptive statement is guilty of fraud or insurance fraud.

If you suspect that a provider has charged you for services you did not receive, billed you twice for the same service, or misrepresented any information, please call us as soon as possible to explain the situation.

Additionally, you can contact your consumer assistance program at
Washington Consumer Assistance Program

5000 Capitol Blvd
Tumwater, WA 98501
(800) 562-6900

https://www.insurance.wa.gov/ (website)
cap@oic.wa.gov (email)

**You Should Know...**

Women need a mix of cardio and weight-bearing exercise at least three to five times a week to help prevent osteoporosis, heart disease, cancer and diabetes. Exercise promotes good self-image, which is important to a woman's mental health.

**Exhibit E**

CERTIFICATION OF ENROLLMENT

**ENGROSSED SUBSTITUTE SENATE BILL 5122**

Chapter 314, Laws of 2011

62nd Legislature
2011 Regular Session

INSURANCE COVERAGE--AFFORDABLE CARE ACT IMPLEMENTATION

EFFECTIVE DATE: 07/22/11 - Except sections 10 through 12, which become effective 01/01/12.

Passed by the Senate April 14, 2011
  YEAS 44  NAYS 2

BRAD OWEN
_____
**President of the Senate**

Passed by the House April 9, 2011
  YEAS 63  NAYS 32

FRANK CHOPP
_____
**Speaker of the House of Representatives**

Approved May 11, 2011, 1:59 p.m.

CERTIFICATE

I, Thomas Hoemann, Secretary of the Senate of the State of Washington, do hereby certify that the attached is **ENGROSSED SUBSTITUTE SENATE BILL 5122** as passed by the Senate and the House of Representatives on the dates hereon set forth.

THOMAS HOEMANN
_____
**Secretary**

FILED

May 11, 2011

CHRISTINE GREGOIRE
_____
**Governor of the State of Washington**

**Secretary of State**
**State of Washington**

ENGROSSED SUBSTITUTE SENATE BILL 5122

AS AMENDED BY THE HOUSE

Passed Legislature - 2011 Regular Session

**State of Washington**      **62nd Legislature**      **2011 Regular Session**

**By** Senate Health & Long-Term Care (originally sponsored by Senators
Keiser and Kline; by request of Insurance Commissioner)

READ FIRST TIME 02/08/11.

1      AN ACT Relating to changes for implementation of the affordable
2  care act in Washington state; amending RCW 48.20.435, 48.21.270,
3  48.43.530, 48.43.535, 48.44.215, 48.44.380, 48.46.325, 48.46.460,
4  48.20.025, 48.44.017, 48.46.062, 48.41.060, 48.41.080, 48.41.100,
5  48.41.140, and 48.21.157; reenacting and amending RCW 48.43.005; adding
6  a new section to chapter 48.43 RCW; and providing an effective date.

7  BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

8      **Sec. 1.**  RCW 48.20.435 and 2007 c 259 s 19 are each amended to read
9  as follows:
10     Any disability insurance contract that provides coverage for a
11 subscriber's dependent must offer the option of covering any
12 ((unmarried)) dependent under the age of ((twenty-five)) twenty-six.

13     **Sec. 2.**  RCW 48.21.270 and 1984 c 190 s 4 are each amended to read
14 as follows:
15     (1) An insurer shall not require proof of insurability as a
16 condition for issuance of the conversion policy.
17     (2) A conversion policy may not contain an exclusion for
18 preexisting conditions ((except)) for any applicant who is under age

nineteen.  For policies issued to those age nineteen and older, an
exclusion for a preexisting condition is permitted only to the extent
that a waiting period for a preexisting condition has not been
satisfied under the group policy.

(3) An insurer must offer at least three policy benefit plans that
comply with the following:

(a) A major medical plan with a five thousand dollar deductible
((and a lifetime benefit maximum of two hundred fifty thousand
dollars)) per person;

(b) A comprehensive medical plan with a five hundred dollar
deductible ((and a lifetime benefit maximum of five hundred thousand
dollars)) per person; and

(c) A basic medical plan with a one thousand dollar deductible
((and a lifetime maximum of seventy-five thousand dollars)) per person.

(4) The insurance commissioner may revise the ((deductibles and
lifetime benefit)) deductible amounts in subsection (3) of this section
from time to time to reflect changing health care costs.

(5) The insurance commissioner shall adopt rules to establish
minimum benefit standards for conversion policies.

(6) The commissioner shall adopt rules to establish specific
standards for conversion policy provisions.  These rules may include
but are not limited to:

(a) Terms of renewability;

(b) Nonduplication of coverage;

(c) Benefit limitations, exceptions, and reductions; and

(d) Definitions of terms.


**Sec. 3.**  RCW 48.43.005 and 2010 c 292 s 1 are each reenacted and
amended to read as follows:

Unless otherwise specifically provided, the definitions in this
section apply throughout this chapter.

(1) "Adjusted community rate" means the rating method used to
establish the premium for health plans adjusted to reflect actuarially
demonstrated differences in utilization or cost attributable to
geographic region, age, family size, and use of wellness activities.

(2) "Adverse benefit determination" means a denial, reduction, or
termination of, or a failure to provide or make payment, in whole or in
part, for a benefit, including a denial, reduction, termination, or

failure to provide or make payment that is based on a determination of an enrollee's or applicant's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment, in whole or in part, for a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

(3) "Basic health plan" means the plan described under chapter 70.47 RCW, as revised from time to time.

(((3))) (4) "Basic health plan model plan" means a health plan as required in RCW 70.47.060(2)(e).

(((4))) (5) "Basic health plan services" means that schedule of covered health services, including the description of how those benefits are to be administered, that are required to be delivered to an enrollee under the basic health plan, as revised from time to time.

(((5))) (6) "Catastrophic health plan" means:

(a) In the case of a contract, agreement, or policy covering a single enrollee, a health benefit plan requiring a calendar year deductible of, at a minimum, one thousand seven hundred fifty dollars and an annual out-of-pocket expense required to be paid under the plan (other than for premiums) for covered benefits of at least three thousand five hundred dollars, both amounts to be adjusted annually by the insurance commissioner; and

(b) In the case of a contract, agreement, or policy covering more than one enrollee, a health benefit plan requiring a calendar year deductible of, at a minimum, three thousand five hundred dollars and an annual out-of-pocket expense required to be paid under the plan (other than for premiums) for covered benefits of at least six thousand dollars, both amounts to be adjusted annually by the insurance commissioner; or

(c) Any health benefit plan that provides benefits for hospital inpatient and outpatient services, professional and prescription drugs provided in conjunction with such hospital inpatient and outpatient services, and excludes or substantially limits outpatient physician services and those services usually provided in an office setting.

In July 2008, and in each July thereafter, the insurance commissioner shall adjust the minimum deductible and out-of-pocket expense required for a plan to qualify as a catastrophic plan to reflect the percentage change in the consumer price index for medical care for a preceding twelve months, as determined by the United States department of labor. The adjusted amount shall apply on the following January 1st.

(((6))) (7) "Certification" means a determination by a review organization that an admission, extension of stay, or other health care service or procedure has been reviewed and, based on the information provided, meets the clinical requirements for medical necessity, appropriateness, level of care, or effectiveness under the auspices of the applicable health benefit plan.

(((7))) (8) "Concurrent review" means utilization review conducted during a patient's hospital stay or course of treatment.

(((8))) (9) "Covered person" or "enrollee" means a person covered by a health plan including an enrollee, subscriber, policyholder, beneficiary of a group plan, or individual covered by any other health plan.

(((9))) (10) "Dependent" means, at a minimum, the enrollee's legal spouse and ((unmarried)) dependent children who qualify for coverage under the enrollee's health benefit plan.

(((10))) (11) "Emergency medical condition" means ((the emergent and acute onset of a symptom or symptoms, including severe pain, that would lead a prudent layperson acting reasonably to believe that a health condition exists that requires immediate medical attention, if failure to provide medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health in serious jeopardy)) a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in a condition (a) placing the health of the individual, or with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy, (b) serious impairment to bodily functions, or (c) serious dysfunction of any bodily organ or part.

1    (((11))) (12) "Emergency services" means ((otherwise covered health
2    care services medically necessary to evaluate and treat an emergency
3    medical condition, provided in a hospital emergency department)) a
4    medical screening examination, as required under section 1867 of the
5    social security act (42 U.S.C. 1395dd), that is within the capability
6    of the emergency department of a hospital, including ancillary services
7    routinely available to the emergency department to evaluate that
8    emergency medical condition, and further medical examination and
9    treatment, to the extent they are within the capabilities of the staff
10   and facilities available at the hospital, as are required under section
11   1867 of the social security act (42 U.S.C. 1395dd) to stabilize the
12   patient.  Stabilize, with respect to an emergency medical condition,
13   has the meaning given in section 1867(e)(3) of the social security act
14   (42 U.S.C. 1395dd(e)(3)).

15   (((12))) (13) "Employee" has the same meaning given to the term, as
16   of January 1, 2008, under section 3(6) of the federal employee
17   retirement income security act of 1974.

18   (((13))) (14) "Enrollee point-of-service cost-sharing" means
19   amounts paid to health carriers directly providing services, health
20   care providers, or health care facilities by enrollees and may include
21   copayments, coinsurance, or deductibles.

22   (((14))) (15) "Final external review decision" means a
23   determination by an independent review organization at the conclusion
24   of an external review.

25   (16) "Final internal adverse benefit determination" means an
26   adverse benefit determination that has been upheld by a health plan or
27   carrier at the completion of the internal appeals process, or an
28   adverse benefit determination with respect to which the internal
29   appeals process has been exhausted under the exhaustion rules described
30   in RCW 48.43.530 and 48.43.535.

31   (17) "Grandfathered health plan" means a group health plan or an
32   individual health plan that under section 1251 of the patient
33   protection and affordable care act, P.L. 111-148 (2010) and as amended
34   by the health care and education reconciliation act, P.L. 111-152
35   (2010) is not subject to subtitles A or C of the act as amended.

36   (18) "Grievance" means a written complaint submitted by or on
37   behalf of a covered person regarding: (a) Denial of payment for
38   medical services or nonprovision of medical services included in the

covered person's health benefit plan, or (b) service delivery issues other than denial of payment for medical services or nonprovision of medical services, including dissatisfaction with medical care, waiting time for medical services, provider or staff attitude or demeanor, or dissatisfaction with service provided by the health carrier.

(((15))) (19) "Health care facility" or "facility" means hospices licensed under chapter 70.127 RCW, hospitals licensed under chapter 70.41 RCW, rural health care facilities as defined in RCW 70.175.020, psychiatric hospitals licensed under chapter 71.12 RCW, nursing homes licensed under chapter 18.51 RCW, community mental health centers licensed under chapter 71.05 or 71.24 RCW, kidney disease treatment centers licensed under chapter 70.41 RCW, ambulatory diagnostic, treatment, or surgical facilities licensed under chapter 70.41 RCW, drug and alcohol treatment facilities licensed under chapter 70.96A RCW, and home health agencies licensed under chapter 70.127 RCW, and includes such facilities if owned and operated by a political subdivision or instrumentality of the state and such other facilities as required by federal law and implementing regulations.

(((16))) (20) "Health care provider" or "provider" means:

(a) A person regulated under Title 18 or chapter 70.127 RCW, to practice health or health-related services or otherwise practicing health care services in this state consistent with state law; or

(b) An employee or agent of a person described in (a) of this subsection, acting in the course and scope of his or her employment.

(((17))) (21) "Health care service" means that service offered or provided by health care facilities and health care providers relating to the prevention, cure, or treatment of illness, injury, or disease.

(((18))) (22) "Health carrier" or "carrier" means a disability insurer regulated under chapter 48.20 or 48.21 RCW, a health care service contractor as defined in RCW 48.44.010, or a health maintenance organization as defined in RCW 48.46.020.

(((19))) (23) "Health plan" or "health benefit plan" means any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services except the following:

(a) Long-term care insurance governed by chapter 48.84 or 48.83 RCW;

(b) Medicare supplemental health insurance governed by chapter 48.66 RCW;

(c) Coverage supplemental to the coverage provided under chapter 55, Title 10, United States Code;

(d) Limited health care services offered by limited health care service contractors in accordance with RCW 48.44.035;

(e) Disability income;

(f) Coverage incidental to a property/casualty liability insurance policy such as automobile personal injury protection coverage and homeowner guest medical;

(g) Workers' compensation coverage;

(h) Accident only coverage;

(i) Specified disease or illness-triggered fixed payment insurance, hospital confinement fixed payment insurance, or other fixed payment insurance offered as an independent, noncoordinated benefit;

(j) Employer-sponsored self-funded health plans;

(k) Dental only and vision only coverage; and

(l) Plans deemed by the insurance commissioner to have a short-term limited purpose or duration, or to be a student-only plan that is guaranteed renewable while the covered person is enrolled as a regular full-time undergraduate or graduate student at an accredited higher education institution, after a written request for such classification by the carrier and subsequent written approval by the insurance commissioner.

(((20))) (24) "Material modification" means a change in the actuarial value of the health plan as modified of more than five percent but less than fifteen percent.

(((21))) (25) "Preexisting condition" means any medical condition, illness, or injury that existed any time prior to the effective date of coverage.

(((22))) (26) "Premium" means all sums charged, received, or deposited by a health carrier as consideration for a health plan or the continuance of a health plan. Any assessment or any "membership," "policy," "contract," "service," or similar fee or charge made by a health carrier in consideration for a health plan is deemed part of the premium. "Premium" shall not include amounts paid as enrollee point-of-service cost-sharing.

1    (((23))) (27) "Review organization" means a disability insurer
2    regulated under chapter 48.20 or 48.21 RCW, health care service
3    contractor as defined in RCW 48.44.010, or health maintenance
4    organization as defined in RCW 48.46.020, and entities affiliated with,
5    under contract with, or acting on behalf of a health carrier to perform
6    a utilization review.

7    (((24))) (28) "Small employer" or "small group" means any person,
8    firm, corporation, partnership, association, political subdivision,
9    sole proprietor, or self-employed individual that is actively engaged
10   in business that employed an average of at least one but no more than
11   fifty employees, during the previous calendar year and employed at
12   least one employee on the first day of the plan year, is not formed
13   primarily for purposes of buying health insurance, and in which a bona
14   fide employer-employee relationship exists. In determining the number
15   of employees, companies that are affiliated companies, or that are
16   eligible to file a combined tax return for purposes of taxation by this
17   state, shall be considered an employer. Subsequent to the issuance of
18   a health plan to a small employer and for the purpose of determining
19   eligibility, the size of a small employer shall be determined annually.
20   Except as otherwise specifically provided, a small employer shall
21   continue to be considered a small employer until the plan anniversary
22   following the date the small employer no longer meets the requirements
23   of this definition. A self-employed individual or sole proprietor who
24   is covered as a group of one must also: (a) Have been employed by the
25   same small employer or small group for at least twelve months prior to
26   application for small group coverage, and (b) verify that he or she
27   derived at least seventy-five percent of his or her income from a trade
28   or business through which the individual or sole proprietor has
29   attempted to earn taxable income and for which he or she has filed the
30   appropriate internal revenue service form 1040, schedule C or F, for
31   the previous taxable year, except a self-employed individual or sole
32   proprietor in an agricultural trade or business, must have derived at
33   least fifty-one percent of his or her income from the trade or business
34   through which the individual or sole proprietor has attempted to earn
35   taxable income and for which he or she has filed the appropriate
36   internal revenue service form 1040, for the previous taxable year.

37   (((25))) (29) "Utilization review" means the prospective,
38   concurrent, or retrospective assessment of the necessity and

1 appropriateness of the allocation of health care resources and services
2 of a provider or facility, given or proposed to be given to an enrollee
3 or group of enrollees.

4 (((26))) (30) "Wellness activity" means an explicit program of an
5 activity consistent with department of health guidelines, such as,
6 smoking cessation, injury and accident prevention, reduction of alcohol
7 misuse, appropriate weight reduction, exercise, automobile and
8 motorcycle safety, blood cholesterol reduction, and nutrition education
9 for the purpose of improving enrollee health status and reducing health
10 service costs.

11    **Sec. 4.**  RCW 48.43.530 and 2000 c 5 s 10 are each amended to read
12 as follows:
13    (1) Each carrier that offers a health plan must have a fully
14 operational, comprehensive grievance process that complies with the
15 requirements of this section and any rules adopted by the commissioner
16 to implement this section.  For the purposes of this section, the
17 commissioner shall consider grievance process standards adopted by
18 national managed care accreditation organizations and state agencies
19 that purchase managed health care services, and for health plans that
20 are not grandfathered health plans as approved by the United States
21 department of health and human services or the United States department
22 of labor.
23    (2) Each carrier must process as a complaint an enrollee's
24 expression of dissatisfaction about customer service or the quality or
25 availability of a health service.  Each carrier must implement
26 procedures for registering and responding to oral and written
27 complaints in a timely and thorough manner.
28    (3) Each carrier must provide written notice to an enrollee or the
29 enrollee's designated representative, and the enrollee's provider, of
30 its decision to deny, modify, reduce, or terminate payment, coverage,
31 authorization, or provision of health care services or benefits,
32 including the admission to or continued stay in a health care facility.
33    (4) Each carrier must process as an appeal an enrollee's written or
34 oral request that the carrier reconsider:  (a) Its resolution of a
35 complaint made by an enrollee; or (b) its decision to deny, modify,
36 reduce, or terminate payment, coverage, authorization, or provision of
37 health care services or benefits, including the admission to, or

continued stay in, a health care facility. A carrier must not require that an enrollee file a complaint prior to seeking appeal of a decision under (b) of this subsection.

(5) To process an appeal, each carrier must:

(a) Provide written notice to the enrollee when the appeal is received;

(b) Assist the enrollee with the appeal process;

(c) Make its decision regarding the appeal within thirty days of the date the appeal is received. An appeal must be expedited if the enrollee's provider or the carrier's medical director reasonably determines that following the appeal process response timelines could seriously jeopardize the enrollee's life, health, or ability to regain maximum function. The decision regarding an expedited appeal must be made within seventy-two hours of the date the appeal is received;

(d) Cooperate with a representative authorized in writing by the enrollee;

(e) Consider information submitted by the enrollee;

(f) Investigate and resolve the appeal; and

(g) Provide written notice of its resolution of the appeal to the enrollee and, with the permission of the enrollee, to the enrollee's providers. The written notice must explain the carrier's decision and the supporting coverage or clinical reasons and the enrollee's right to request independent review of the carrier's decision under RCW 48.43.535.

(6) Written notice required by subsection (3) of this section must explain:

(a) The carrier's decision and the supporting coverage or clinical reasons; and

(b) The carrier's appeal process, including information, as appropriate, about how to exercise the enrollee's rights to obtain a second opinion, and how to continue receiving services as provided in this section.

(7) When an enrollee requests that the carrier reconsider its decision to modify, reduce, or terminate an otherwise covered health service that an enrollee is receiving through the health plan and the carrier's decision is based upon a finding that the health service, or level of health service, is no longer medically necessary or appropriate, the carrier must continue to provide that health service

1   until the appeal is resolved.  If the resolution of the appeal or any
2   review sought by the enrollee under RCW 48.43.535 affirms the carrier's
3   decision, the enrollee may be responsible for the cost of this
4   continued health service.

5       (8) Each carrier must provide a clear explanation of the grievance
6   process upon request, upon enrollment to new enrollees, and annually to
7   enrollees and subcontractors.

8       (9) Each carrier must ensure that the grievance process is
9   accessible to enrollees who are limited English speakers, who have
10  literacy problems, or who have physical or mental disabilities that
11  impede their ability to file a grievance.

12      (10) Each carrier must:  Track each appeal until final resolution;
13  maintain, and make accessible to the commissioner for a period of three
14  years, a log of all appeals; and identify and evaluate trends in
15  appeals.

16      **Sec. 5.**  RCW 48.43.535 and 2000 c 5 s 11 are each amended to read
17  as follows:

18      (1) There is a need for a process for the fair consideration of
19  disputes relating to decisions by carriers that offer a health plan to
20  deny, modify, reduce, or terminate coverage of or payment for health
21  care services for an enrollee.

22      (2) An enrollee may seek review by a certified independent review
23  organization of a carrier's decision to deny, modify, reduce, or
24  terminate coverage of or payment for a health care service, after
25  exhausting the carrier's grievance process and receiving a decision
26  that is unfavorable to the enrollee, or after the carrier has exceeded
27  the timelines for grievances provided in RCW 48.43.530, without good
28  cause and without reaching a decision.

29      (3) The commissioner must establish and use a rotational registry
30  system for the assignment of a certified independent review
31  organization to each dispute.  The system should be flexible enough to
32  ensure that an independent review organization has the expertise
33  necessary to review the particular medical condition or service at
34  issue in the dispute, and that any approved independent review
35  organization does not have a conflict of interest that will influence
36  its independence.

1    (4) Carriers must provide to the appropriate certified independent
2  review organization, not later than the third business day after the
3  date the carrier receives a request for review, a copy of:

4    (a) Any medical records of the enrollee that are relevant to the
5  review;

6    (b) Any documents used by the carrier in making the determination
7  to be reviewed by the certified independent review organization;

8    (c) Any documentation and written information submitted to the
9  carrier in support of the appeal; and

10    (d) A list of each physician or health care provider who has
11  provided care to the enrollee and who may have medical records relevant
12  to the appeal.  Health information or other confidential or proprietary
13  information in the custody of a carrier may be provided to an
14  independent review organization, subject to rules adopted by the
15  commissioner.

16    (5) Enrollees must be provided with at least five business days to
17  submit to the independent review organization in writing additional
18  information that the independent review organization must consider when
19  conducting the external review.  The independent review organization
20  must forward any additional information submitted by an enrollee to the
21  plan or carrier within one business day of receipt by the independent
22  review organization.

23    (6) The medical reviewers from a certified independent review
24  organization will make determinations regarding the medical necessity
25  or appropriateness of, and the application of health plan coverage
26  provisions to, health care services for an enrollee.  The medical
27  reviewers' determinations must be based upon their expert medical
28  judgment, after consideration of relevant medical, scientific, and
29  cost-effectiveness evidence, and medical standards of practice in the
30  state of Washington.  Except as provided in this subsection, the
31  certified independent review organization must ensure that
32  determinations are consistent with the scope of covered benefits as
33  outlined in the medical coverage agreement.  Medical reviewers may
34  override the health plan's medical necessity or appropriateness
35  standards if the standards are determined upon review to be
36  unreasonable or inconsistent with sound, evidence-based medical
37  practice.

1    (((6))) (7) Once a request for an independent review determination
2    has been made, the independent review organization must proceed to a
3    final determination, unless requested otherwise by both the carrier and
4    the enrollee or the enrollee's representative.

5    (((7))) (a) An enrollee or carrier may request an expedited
6    external review if the adverse benefit determination or internal
7    adverse benefit determination concerns an admission, availability of
8    care, continued stay, or health care service for which the claimant
9    received emergency services but has not been discharged from a
10   facility; or involves a medical condition for which the standard
11   external review time frame of forty-five days would seriously
12   jeopardize the life or health of the enrollee or jeopardize the
13   enrollee's ability to regain maximum function. The independent review
14   organization must make its decision to uphold or reverse the adverse
15   benefit determination or final internal adverse benefit determination
16   and notify the enrollee and the carrier or health plan of the
17   determination as expeditiously as possible but within not more than
18   seventy-two hours after the receipt of the request for expedited
19   external review. If the notice is not in writing, the independent
20   review organization must provide written confirmation of the decision
21   within forty-eight hours after the date of the notice of the decision.

22   (b) For claims involving experimental or investigational
23   treatments, the internal review organization must ensure that adequate
24   clinical and scientific experience and protocols are taken into account
25   as part of the external review process.

26   (8) Carriers must timely implement the certified independent review
27   organization's determination, and must pay the certified independent
28   review organization's charges.

29   (((8))) (9) When an enrollee requests independent review of a
30   dispute under this section, and the dispute involves a carrier's
31   decision to modify, reduce, or terminate an otherwise covered health
32   service that an enrollee is receiving at the time the request for
33   review is submitted and the carrier's decision is based upon a finding
34   that the health service, or level of health service, is no longer
35   medically necessary or appropriate, the carrier must continue to
36   provide the health service if requested by the enrollee until a
37   determination is made under this section. If the determination affirms

1  the carrier's decision, the enrollee may be responsible for the cost of
2  the continued health service.
3  ((~~(9)~~)) (10) Each certified independent review organization must
4  maintain written records and make them available upon request to the
5  commissioner.
6  (11) A certified independent review organization may notify the
7  office of the insurance commissioner if, based upon its review of
8  disputes under this section, it finds a pattern of substandard or
9  egregious conduct by a carrier.
10  ((~~(10)~~)) (12)(a) The commissioner shall adopt rules to implement
11  this section after considering relevant standards adopted by national
12  managed care accreditation organizations and the national association
13  of insurance commissioners.
14  (b) This section is not intended to supplant any existing authority
15  of the office of the insurance commissioner under this title to oversee
16  and enforce carrier compliance with applicable statutes and rules.

17  **Sec. 6.** RCW 48.44.215 and 2007 c 259 s 21 are each amended to read
18  as follows:
19  (1) Any individual health care service plan contract that provides
20  coverage for a subscriber's dependent must offer the option of covering
21  any ((~~unmarried~~)) dependent under the age of ((~~twenty-five~~)) twenty-
22  six.
23  (2) Any group health care service plan contract that provides
24  coverage for a participating member's dependent must offer each
25  participating member the option of covering any ((~~unmarried~~)) dependent
26  under the age of ((~~twenty-five~~)) twenty-six.

27  **Sec. 7.** RCW 48.44.380 and 1984 c 190 s 7 are each amended to read
28  as follows:
29  (1) A health care service contractor shall not require proof of
30  insurability as a condition for issuance of the conversion contract.
31  (2) A conversion contract may not contain an exclusion for
32  preexisting conditions ((~~except~~)) for any applicant who is under age
33  nineteen. For policies issued to those age nineteen and older, an
34  exclusion for a preexisting condition is permitted only to the extent
35  that a waiting period for a preexisting condition has not been
36  satisfied under the group contract.

(3) A health care service contractor must offer at least three contract benefit plans that comply with the following:

(a) A major medical plan with a five thousand dollar deductible ((~~and a lifetime benefit maximum of two hundred fifty thousand dollars~~)) per person;

(b) A comprehensive medical plan with a five hundred dollar deductible ((~~and a lifetime benefit maximum of five hundred thousand dollars~~)) per person; and

(c) A basic medical plan with a one thousand dollar deductible ((~~and a lifetime maximum of seventy-five thousand dollars~~)) per person.

(4) The insurance commissioner may revise the ((~~deductibles and lifetime benefit~~)) deductible amounts in subsection (3) of this section from time to time to reflect changing health care costs.

(5) The insurance commissioner shall adopt rules to establish minimum benefit standards for conversion contracts.

(6) The commissioner shall adopt rules to establish specific standards for conversion contract provisions. These rules may include but are not limited to:

(a) Terms of renewability;

(b) Nonduplication of coverage;

(c) Benefit limitations, exceptions, and reductions; and

(d) Definitions of terms.


**Sec. 8.** RCW 48.46.325 and 2007 c 259 s 22 are each amended to read as follows:

(1) Any individual health maintenance agreement that provides coverage for a subscriber's dependent must offer the option of covering any ((~~unmarried~~)) dependent under the age of ((~~twenty-five~~)) twenty-six.

(2) Any group health maintenance agreement that provides coverage for a participating member's dependent must offer each participating member the option of covering any ((~~unmarried~~)) dependent under the age of ((~~twenty-five~~)) twenty-six.


**Sec. 9.** RCW 48.46.460 and 1984 c 190 s 10 are each amended to read as follows:

(1) A health maintenance organization must offer a conversion

1  agreement for comprehensive health care services and shall not require
2  proof of insurability as a condition for issuance of the conversion
3  agreement.

4      (2) A conversion agreement may not contain an exclusion for
5  preexisting conditions ((except)) <u>for an applicant who is under age</u>
6  <u>nineteen.  For policies issued to those age nineteen and older, an</u>
7  <u>exclusion for a preexisting condition is permitted only</u> to the extent
8  that a waiting period for a preexisting condition has not been
9  satisfied under the group agreement.

10     (3) A conversion agreement need not provide benefits identical to
11 those provided under the group agreement.  The conversion agreement may
12 contain provisions requiring the person covered by the conversion
13 agreement to pay reasonable deductibles and copayments<u>, except for</u>
14 <u>preventive service benefits as defined in 45 C.F.R. 147.130 (2010),</u>
15 <u>implementing sections 2701 through 2763, 2791, and 2792 of the public</u>
16 <u>health service act (42 U.S.C. 300gg through 300gg-63, 300gg-91, and</u>
17 <u>300gg-92), as amended</u>.

18     (4) The insurance commissioner shall adopt rules to establish
19 minimum benefit standards for conversion agreements.

20     (5) The commissioner shall adopt rules to establish specific
21 standards for conversion agreement provisions.  These rules may include
22 but are not limited to:

23     (a) Terms of renewability;

24     (b) Nonduplication of coverage;

25     (c) Benefit limitations, exceptions, and reductions; and

26     (d) Definitions of terms.

27     **Sec. 10.**  RCW 48.20.025 and 2008 c 303 s 4 are each amended to read
28 as follows:

29     (1) The definitions in this subsection apply throughout this
30 section unless the context clearly requires otherwise.

31     (a) "Claims" means the cost to the insurer of health care services,
32 as defined in RCW 48.43.005, provided to a policyholder or paid to or
33 on behalf of the policyholder in accordance with the terms of a health
34 benefit plan, as defined in RCW 48.43.005.  This includes capitation
35 payments or other similar payments made to providers for the purpose of
36 paying for health care services for a policyholder.

(b) "Claims reserves" means:  (i) The liability for claims which have been reported but not paid; (ii) the liability for claims which have not been reported but which may reasonably be expected; (iii) active life reserves; and (iv) additional claims reserves whether for a specific liability purpose or not.

(c) "Declination rate" for an insurer means the percentage of the total number of applicants for individual health benefit plans received by that insurer in the aggregate in the applicable year which are not accepted for enrollment by that insurer based on the results of the standard health questionnaire administered pursuant to RCW 48.43.018(2)(a).

(d) "Earned premiums" means premiums, as defined in RCW 48.43.005, plus any rate credits or recoupments less any refunds, for the applicable period, whether received before, during, or after the applicable period.

(e) "Incurred claims expense" means claims paid during the applicable period plus any increase, or less any decrease, in the claims reserves.

(f) "Loss ratio" means incurred claims expense as a percentage of earned premiums.

(g) "Reserves" means:  (i) Active life reserves; and (ii) additional reserves whether for a specific liability purpose or not.

(2) An insurer must file supporting documentation of its method of determining the rates charged for its individual health benefit plans. At a minimum, the insurer must provide the following supporting documentation:

(a) A description of the insurer's rate-making methodology;

(b) An actuarially determined estimate of incurred claims which includes the experience data, assumptions, and justifications of the insurer's projection;

(c) The percentage of premium attributable in aggregate for nonclaims expenses used to determine the adjusted community rates charged; and

(d) A certification by a member of the American academy of actuaries, or other person approved by the commissioner, that the adjusted community rate charged can be reasonably expected to result in a loss ratio that meets or exceeds the loss ratio standard of

seventy-four percent, minus the premium tax rate applicable to the insurer's individual health benefit plans under RCW 48.14.020.

(((3) By the last day of May each year any insurer issuing or renewing individual health benefit plans in this state during the preceding calendar year shall file for review by the commissioner supporting documentation of its actual loss ratio and its actual declination rate for its individual health benefit plans offered or renewed in the state in aggregate for the preceding calendar year. The filing shall include aggregate earned premiums, aggregate incurred claims, and a certification by a member of the American academy of actuaries, or other person approved by the commissioner, that the actual loss ratio has been calculated in accordance with accepted actuarial principles.

(a) At the expiration of a thirty-day period beginning with the date the filing is received by the commissioner, the filing shall be deemed approved unless prior thereto the commissioner contests the calculation of the actual loss ratio.

(b) If the commissioner contests the calculation of the actual loss ratio, the commissioner shall state in writing the grounds for contesting the calculation to the insurer.

(c) Any dispute regarding the calculation of the actual loss ratio shall, upon written demand of either the commissioner or the insurer, be submitted to hearing under chapters 48.04 and 34.05 RCW.

(4) If the actual loss ratio for the preceding calendar year is less than the loss ratio established in subsection (5) of this section, a remittance is due and the following shall apply:

(a) The insurer shall calculate a percentage of premium to be remitted to the Washington state health insurance pool by subtracting the actual loss ratio for the preceding year from the loss ratio established in subsection (5) of this section.

(b) The remittance to the Washington state health insurance pool is the percentage calculated in (a) of this subsection, multiplied by the premium earned from each enrollee in the previous calendar year. Interest shall be added to the remittance due at a five percent annual rate calculated from the end of the calendar year for which the remittance is due to the date the remittance is made.

(c) All remittances shall be aggregated and such amounts shall be

1 ~~remitted to the Washington state high risk pool to be used as directed~~
2 ~~by the pool board of directors.~~
3 ~~(d) Any remittance required to be issued under this section shall~~
4 ~~be issued within thirty days after the actual loss ratio is deemed~~
5 ~~approved under subsection (3)(a) of this section or the determination~~
6 ~~by an administrative law judge under subsection (3)(c) of this section.~~
7 ~~(5) The loss ratio applicable to this section shall be the~~
8 ~~percentage set forth in the following schedule that correlates to the~~
9 ~~insurer's actual declination rate in the preceding year, minus the~~
10 ~~premium tax rate applicable to the insurer's individual health benefit~~
11 ~~plans under RCW 48.14.020.~~

| | |
|---|---|
| 12 ~~Actual Declination Rate~~ | ~~Loss Ratio~~ |
| 13 ~~Under Six Percent (6%)~~ | ~~Seventy-Four Percent (74%)~~ |
| 14 ~~Six Percent (6%) or more (but less than Seven Percent)~~ | ~~Seventy-Five Percent (75%)~~ |
| 15 ~~Seven Percent (7%) or more (but less than Eight Percent)~~ | ~~Seventy-Six Percent (76%)~~ |
| 16 ~~Eight Percent (8%) or more~~ | ~~Seventy-Seven Percent (77%)))~~ |

17      **Sec. 11.**  RCW 48.44.017 and 2008 c 303 s 5 are each amended to read
18 as follows:

19      (1)  The definitions in this subsection apply throughout this
20 section unless the context clearly requires otherwise.

21      (a) "Claims" means the cost to the health care service contractor
22 of health care services, as defined in RCW 48.43.005, provided to a
23 contract holder or paid to or on behalf of a contract holder in
24 accordance with the terms of a health benefit plan, as defined in RCW
25 48.43.005.  This includes capitation payments or other similar payments
26 made to providers for the purpose of paying for health care services
27 for an enrollee.

28      (b) "Claims reserves" means:  (i) The liability for claims which
29 have been reported but not paid; (ii) the liability for claims which
30 have not been reported but which may reasonably be expected; (iii)
31 active life reserves; and (iv) additional claims reserves whether for
32 a specific liability purpose or not.

33      (c) "Declination rate" for a health care service contractor means
34 the percentage of the total number of applicants for individual health
35 benefit plans received by that health care service contractor in the
36 aggregate in the applicable year which are not accepted for enrollment

by that health care service contractor based on the results of the standard health questionnaire administered pursuant to RCW 48.43.018(2)(a).

(d) "Earned premiums" means premiums, as defined in RCW 48.43.005, plus any rate credits or recoupments less any refunds, for the applicable period, whether received before, during, or after the applicable period.

(e) "Incurred claims expense" means claims paid during the applicable period plus any increase, or less any decrease, in the claims reserves.

(f) "Loss ratio" means incurred claims expense as a percentage of earned premiums.

(g) "Reserves" means: (i) Active life reserves; and (ii) additional reserves whether for a specific liability purpose or not.

(2) A health care service contractor must file supporting documentation of its method of determining the rates charged for its individual contracts. At a minimum, the health care service contractor must provide the following supporting documentation:

(a) A description of the health care service contractor's rate-making methodology;

(b) An actuarially determined estimate of incurred claims which includes the experience data, assumptions, and justifications of the health care service contractor's projection;

(c) The percentage of premium attributable in aggregate for nonclaims expenses used to determine the adjusted community rates charged; and

(d) A certification by a member of the American academy of actuaries, or other person approved by the commissioner, that the adjusted community rate charged can be reasonably expected to result in a loss ratio that meets or exceeds the loss ratio standard of seventy-four percent, minus the premium tax rate applicable to the carrier's individual health benefit plans under RCW 48.14.0201.

((~~(3) By the last day of May each year any health care service contractor issuing or renewing individual health benefit plans in this state during the preceding calendar year shall file for review by the commissioner supporting documentation of its actual loss ratio and its actual declination rate for its individual health benefit plans offered or renewed in this state in aggregate for the preceding calendar year.~~

1 ~~The filing shall include aggregate earned premiums, aggregate incurred~~
2 ~~claims, and a certification by a member of the American academy of~~
3 ~~actuaries, or other person approved by the commissioner, that the~~
4 ~~actual loss ratio has been calculated in accordance with accepted~~
5 ~~actuarial principles.~~
6 ~~(a) At the expiration of a thirty-day period beginning with the~~
7 ~~date the filing is received by the commissioner, the filing shall be~~
8 ~~deemed approved unless prior thereto the commissioner contests the~~
9 ~~calculation of the actual loss ratio.~~
10 ~~(b) If the commissioner contests the calculation of the actual loss~~
11 ~~ratio, the commissioner shall state in writing the grounds for~~
12 ~~contesting the calculation to the health care service contractor.~~
13 ~~(c) Any dispute regarding the calculation of the actual loss ratio~~
14 ~~shall upon written demand of either the commissioner or the health care~~
15 ~~service contractor be submitted to hearing under chapters 48.04 and~~
16 ~~34.05 RCW.~~
17 ~~(4) If the actual loss ratio for the preceding calendar year is~~
18 ~~less than the loss ratio standard established in subsection (5) of this~~
19 ~~section, a remittance is due and the following shall apply:~~
20 ~~(a) The health care service contractor shall calculate a percentage~~
21 ~~of premium to be remitted to the Washington state health insurance pool~~
22 ~~by subtracting the actual loss ratio for the preceding year from the~~
23 ~~loss ratio established in subsection (5) of this section.~~
24 ~~(b) The remittance to the Washington state health insurance pool is~~
25 ~~the percentage calculated in (a) of this subsection, multiplied by the~~
26 ~~premium earned from each enrollee in the previous calendar year.~~
27 ~~Interest shall be added to the remittance due at a five percent annual~~
28 ~~rate calculated from the end of the calendar year for which the~~
29 ~~remittance is due to the date the remittance is made.~~
30 ~~(c) All remittances shall be aggregated and such amounts shall be~~
31 ~~remitted to the Washington state high risk pool to be used as directed~~
32 ~~by the pool board of directors.~~
33 ~~(d) Any remittance required to be issued under this section shall~~
34 ~~be issued within thirty days after the actual loss ratio is deemed~~
35 ~~approved under subsection (3)(a) of this section or the determination~~
36 ~~by an administrative law judge under subsection (3)(c) of this section.~~
37 ~~(5) The loss ratio applicable to this section shall be the~~
38 ~~percentage set forth in the following schedule that correlates to the~~

1 ~~health-care-service-contractor's-actual-declination-rate-in-the~~
2 ~~preceding year, minus the premium tax rate applicable to the health~~
3 ~~care-service-contractor's-individual-health-benefit-plans-under-RCW~~
4 ~~48.14.0201.~~

| | |
|---|---|
| 5 ~~Actual Declination Rate~~ | ~~Loss Ratio~~ |
| 6 ~~Under Six Percent (6%)~~ | ~~Seventy-Four Percent (74%)~~ |
| 7 ~~Six Percent (6%) or more (but less than Seven Percent)~~ | ~~Seventy-Five Percent (75%)~~ |
| 8 ~~Seven Percent (7%) or more (but less than Eight Percent)~~ | ~~Seventy-Six Percent (76%)~~ |
| 9 ~~Eight Percent (8%) or more~~ | ~~Seventy-Seven Percent (77%)))~~ |

10    **Sec. 12.**  RCW 48.46.062 and 2008 c 303 s 6 are each amended to read
11 as follows:

12    (1) The definitions in this subsection apply throughout this
13 section unless the context clearly requires otherwise.

14    (a) "Claims" means the cost to the health maintenance organization
15 of health care services, as defined in RCW 48.43.005, provided to an
16 enrollee or paid to or on behalf of the enrollee in accordance with the
17 terms of a health benefit plan, as defined in RCW 48.43.005.  This
18 includes capitation payments or other similar payments made to
19 providers for the purpose of paying for health care services for an
20 enrollee.

21    (b) "Claims reserves" means:  (i) The liability for claims which
22 have been reported but not paid; (ii) the liability for claims which
23 have not been reported but which may reasonably be expected; (iii)
24 active life reserves; and (iv) additional claims reserves whether for
25 a specific liability purpose or not.

26    (c) "Declination rate" for a health maintenance organization means
27 the percentage of the total number of applicants for individual health
28 benefit plans received by that health maintenance organization in the
29 aggregate in the applicable year which are not accepted for enrollment
30 by that health maintenance organization based on the results of the
31 standard health questionnaire administered pursuant to RCW
32 48.43.018(2)(a).

33    (d) "Earned premiums" means premiums, as defined in RCW 48.43.005,
34 plus any rate credits or recoupments less any refunds, for the
35 applicable period, whether received before, during, or after the
36 applicable period.

(e) "Incurred claims expense" means claims paid during the applicable period plus any increase, or less any decrease, in the claims reserves.

(f) "Loss ratio" means incurred claims expense as a percentage of earned premiums.

(g) "Reserves" means: (i) Active life reserves; and (ii) additional reserves whether for a specific liability purpose or not.

(2) A health maintenance organization must file supporting documentation of its method of determining the rates charged for its individual agreements. At a minimum, the health maintenance organization must provide the following supporting documentation:

(a) A description of the health maintenance organization's rate-making methodology;

(b) An actuarially determined estimate of incurred claims which includes the experience data, assumptions, and justifications of the health maintenance organization's projection;

(c) The percentage of premium attributable in aggregate for nonclaims expenses used to determine the adjusted community rates charged; and

(d) A certification by a member of the American academy of actuaries, or other person approved by the commissioner, that the adjusted community rate charged can be reasonably expected to result in a loss ratio that meets or exceeds the loss ratio standard of seventy-four percent, minus the premium tax rate applicable to the carrier's individual health benefit plans under RCW 48.14.0201.

(((3) By the last day of May each year any health maintenance organization issuing or renewing individual health benefit plans in this state during the preceding calendar year shall file for review by the commissioner supporting documentation of its actual loss ratio and its actual declination rate for its individual health benefit plans offered or renewed in the state in aggregate for the preceding calendar year. The filing shall include aggregate earned premiums, aggregate incurred claims, and a certification by a member of the American academy of actuaries, or other person approved by the commissioner, that the actual loss ratio has been calculated in accordance with accepted actuarial principles.

(a) At the expiration of a thirty-day period beginning with the

1   date the filing is received by the commissioner, the filing shall be
2   deemed approved unless prior thereto the commissioner contests the
3   calculation of the actual loss ratio.
4       (b) If the commissioner contests the calculation of the actual loss
5   ratio, the commissioner shall state in writing the grounds for
6   contesting the calculation to the health maintenance organization.
7       (c) Any dispute regarding the calculation of the actual loss ratio
8   shall, upon written demand of either the commissioner or the health
9   maintenance organization, be submitted to hearing under chapters 48.04
10  and 34.05 RCW.
11      (4) If the actual loss ratio for the preceding calendar year is
12  less than the loss ratio standard established in subsection (5) of this
13  section, a remittance is due and the following shall apply:
14      (a) The health maintenance organization shall calculate a
15  percentage of premium to be remitted to the Washington state health
16  insurance pool by subtracting the actual loss ratio for the preceding
17  year from the loss ratio established in subsection (5) of this section.
18      (b) The remittance to the Washington state health insurance pool is
19  the percentage calculated in (a) of this subsection, multiplied by the
20  premium earned from each enrollee in the previous calendar year.
21  Interest shall be added to the remittance due at a five percent annual
22  rate calculated from the end of the calendar year for which the
23  remittance is due to the date the remittance is made.
24      (c) All remittances shall be aggregated and such amounts shall be
25  remitted to the Washington state high risk pool to be used as directed
26  by the pool board of directors.
27      (d) Any remittance required to be issued under this section shall
28  be issued within thirty days after the actual loss ratio is deemed
29  approved under subsection (3)(a) of this section or the determination
30  by an administrative law judge under subsection (3)(c) of this section.
31      (5) The loss ratio applicable to this section shall be the
32  percentage set forth in the following schedule that correlates to the
33  health maintenance organization's actual declination rate in the
34  preceding year, minus the premium tax rate applicable to the health
35  maintenance organization's individual health benefit plans under RCW
36  48.14.0201.

| | | |
|---|---|---|
| 1 | ~~Actual Declination Rate~~ | ~~Loss Ratio~~ |
| 2 | ~~Under Six Percent (6%)~~ | ~~Seventy-Four Percent (74%)~~ |
| 3 | ~~Six Percent (6%) or more (but less than Seven Percent)~~ | ~~Seventy-Five Percent (75%)~~ |
| 4 | ~~Seven Percent (7%) or more (but less than Eight Percent)~~ | ~~Seventy-Six Percent (76%)~~ |
| 5 | ~~Eight Percent (8%) or more~~ | ~~Seventy-Seven Percent (77%)))~~ |

6    **Sec. 13.**  RCW 48.41.060 and 2009 c 555 s 2 are each amended to read
7 as follows:

8    (1) The board shall have the general powers and authority granted
9 under the laws of this state to insurance companies, health care
10 service contractors, and health maintenance organizations, licensed or
11 registered to offer or provide the kinds of health coverage defined
12 under this title.  In addition thereto, the board shall:

13    (a) Designate or establish the standard health questionnaire to be
14 used under RCW 48.41.100 and 48.43.018, including the form and content
15 of the standard health questionnaire and the method of its application.
16 The questionnaire must provide for an objective evaluation of an
17 individual's health status by assigning a discreet measure, such as a
18 system of point scoring to each individual.  The questionnaire must not
19 contain any questions related to pregnancy, and pregnancy shall not be
20 a basis for coverage by the pool.  The questionnaire shall be designed
21 such that it is reasonably expected to identify the eight percent of
22 persons who are the most costly to treat who are under individual
23 coverage in health benefit plans, as defined in RCW 48.43.005, in
24 Washington state or are covered by the pool, if applied to all such
25 persons;

26    (b) Obtain from a member of the American academy of actuaries, who
27 is independent of the board, a certification that the standard health
28 questionnaire meets the requirements of (a) of this subsection;

29    (c) Approve the standard health questionnaire and any modifications
30 needed to comply with this chapter.  The standard health questionnaire
31 shall be submitted to an actuary for certification, modified as
32 necessary, and approved at least every thirty-six months <u>unless at the</u>
33 <u>time when certification is required the pool will be discontinued</u>
34 <u>before the end of the succeeding thirty-six month period</u>.  The
35 designation and approval of the standard health questionnaire by the
36 board shall not be subject to review and approval by the commissioner.

The standard health questionnaire or any modification thereto shall not be used until ninety days after public notice of the approval of the questionnaire or any modification thereto, except that the initial standard health questionnaire approved for use by the board after March 23, 2000, may be used immediately following public notice of such approval;

(d) Establish appropriate rates, rate schedules, rate adjustments, expense allowances, claim reserve formulas and any other actuarial functions appropriate to the operation of the pool. Rates shall not be unreasonable in relation to the coverage provided, the risk experience, and expenses of providing the coverage. Rates and rate schedules may be adjusted for appropriate risk factors such as age and area variation in claim costs and shall take into consideration appropriate risk factors in accordance with established actuarial underwriting practices consistent with Washington state individual plan rating requirements under RCW 48.44.022 and 48.46.064;

(e)(i) Assess members of the pool in accordance with the provisions of this chapter, and make advance interim assessments as may be reasonable and necessary for the organizational or interim operating expenses. Any interim assessments will be credited as offsets against any regular assessments due following the close of the year.

(ii) Self-funded multiple employer welfare arrangements are subject to assessment under this subsection only in the event that assessments are not preempted by the employee retirement income security act of 1974, as amended, 29 U.S.C. Sec. 1001 et seq. The arrangements and the commissioner shall initially request an advisory opinion from the United States department of labor or obtain a declaratory ruling from a federal court on the legality of imposing assessments on these arrangements before imposing the assessment. Once the legality of the assessments has been determined, the multiple employer welfare arrangement certified by the insurance commissioner must begin payment of these assessments.

(iii) If there has not been a final determination of the legality of these assessments, then beginning on the earlier of (A) the date the fourth multiple employer welfare arrangement has been certified by the insurance commissioner, or (B) April 1, 2006, the arrangement shall deposit the assessments imposed by this subsection into an interest bearing escrow account maintained by the arrangement. Upon a final

1 determination that the assessments are not preempted by the employee
2 retirement income security act of 1974, as amended, 29 U.S.C. Sec. 1001
3 et seq., all funds in the interest bearing escrow account shall be
4 transferred to the board;

5 (f) Issue policies of health coverage in accordance with the
6 requirements of this chapter;

7 (g) Establish procedures for the administration of the premium
8 discount provided under RCW 48.41.200(3)(a)(iii);

9 (h) Contract with the Washington state health care authority for
10 the administration of the premium discounts provided under RCW
11 48.41.200(3)(a) (i) and (ii);

12 (i) Set a reasonable fee to be paid to an insurance producer
13 licensed in Washington state for submitting an acceptable application
14 for enrollment in the pool; and

15 (j) Provide certification to the commissioner when assessments will
16 exceed the threshold level established in RCW 48.41.037.

17 (2) In addition thereto, the board may:

18 (a) Enter into contracts as are necessary or proper to carry out
19 the provisions and purposes of this chapter including the authority,
20 with the approval of the commissioner, to enter into contracts with
21 similar pools of other states for the joint performance of common
22 administrative functions, or with persons or other organizations for
23 the performance of administrative functions;

24 (b) Sue or be sued, including taking any legal action as necessary
25 to avoid the payment of improper claims against the pool or the
26 coverage provided by or through the pool;

27 (c) Appoint appropriate legal, actuarial, and other committees as
28 necessary to provide technical assistance in the operation of the pool,
29 policy, and other contract design, and any other function within the
30 authority of the pool; and

31 (d) Conduct periodic audits to assure the general accuracy of the
32 financial data submitted to the pool, and the board shall cause the
33 pool to have an annual audit of its operations by an independent
34 certified public accountant.

35 (3) Nothing in this section shall be construed to require or
36 authorize the adoption of rules under chapter 34.05 RCW.

**Sec. 14.** RCW 48.41.080 and 2000 c 79 s 10 are each amended to read as follows:

The board shall select an administrator through a competitive bidding process to administer the pool.

(1) The board shall evaluate bids based upon criteria established by the board, which shall include:

(a) The administrator's proven ability to handle health coverage;

(b) The efficiency of the administrator's claim-paying procedures;

(c) An estimate of the total charges for administering the plan; and

(d) The administrator's ability to administer the pool in a cost-effective manner.

(2) The administrator shall serve for a period of three years subject to removal for cause. At least six months prior to the expiration of each three-year period of service by the administrator, the board shall invite all interested parties, including the current administrator, to submit bids to serve as the administrator for the succeeding three-year period. Selection of the administrator for this succeeding period shall be made at least three months prior to the end of the current three-year period, unless at the time required for submission of bids pursuant to this subsection to the pool will be discontinued before the end of the succeeding thirty-six month period.

(3) The administrator shall perform such duties as may be assigned by the board including:

(a) Administering eligibility and administrative claim payment functions relating to the pool;

(b) Establishing a premium billing procedure for collection of premiums from covered persons. Billings shall be made on a periodic basis as determined by the board, which shall not be more frequent than a monthly billing;

(c) Performing all necessary functions to assure timely payment of benefits to covered persons under the pool including:

(i) Making available information relating to the proper manner of submitting a claim for benefits to the pool, and distributing forms upon which submission shall be made;

(ii) Taking steps necessary to offer and administer managed care benefit plans; and

1    (iii) Evaluating the eligibility of each claim for payment by the
2    pool;

3    (d) Submission of regular reports to the board regarding the
4    operation of the pool.  The frequency, content, and form of the report
5    shall be as determined by the board;

6    (e) Following the close of each accounting year, determination of
7    net paid and earned premiums, the expense of administration, and the
8    paid and incurred losses for the year and reporting this information to
9    the board and the commissioner on a form as prescribed by the
10   commissioner.

11   (4) The administrator shall be paid as provided in the contract
12   between the board and the administrator for its expenses incurred in
13   the performance of its services.

14   **Sec. 15.**  RCW 48.41.100 and 2009 c 555 s 3 are each amended to read
15   as follows:

16   (1)(a) The following persons who are residents of this state are
17   eligible for pool coverage:

18   (i) Any person who provides evidence of a carrier's decision not to
19   accept him or her for enrollment in an individual health benefit plan
20   as defined in RCW 48.43.005 based upon, and within ninety days of the
21   receipt of, the results of the standard health questionnaire designated
22   by the board and administered by health carriers under RCW 48.43.018;

23   (ii) Any person who continues to be eligible for pool coverage
24   based upon the results of the standard health questionnaire designated
25   by the board and administered by the pool administrator pursuant to
26   subsection (3) of this section;

27   (iii) Any person who resides in a county of the state where no
28   carrier or insurer eligible under chapter 48.15 RCW offers to the
29   public an individual health benefit plan other than a catastrophic
30   health plan as defined in RCW 48.43.005 at the time of application to
31   the pool, and who makes direct application to the pool;

32   (iv) Any person becoming eligible for medicare before August 1,
33   2009, who provides evidence of (A) a rejection for medical reasons, (B)
34   a requirement of restrictive riders, (C) an up-rated premium, (D) a
35   preexisting conditions limitation, or (E) lack of access to or for a
36   comprehensive medicare supplemental insurance policy under chapter

48.66 RCW, the effect of any of which is to substantially reduce coverage from that received by a person considered a standard risk by at least one member within six months of the date of application; and

(v) Any person becoming eligible for medicare on or after August 1, 2009, who does not have access to a reasonable choice of comprehensive medicare part C plans, as defined in (b) of this subsection, and who provides evidence of (A) a rejection for medical reasons, (B) a requirement of restrictive riders, (C) an up-rated premium, (D) a preexisting conditions limitation, or (E) lack of access to or for a comprehensive medicare supplemental insurance policy under chapter 48.66 RCW, the effect of any of which is to substantially reduce coverage from that received by a person considered a standard risk by at least one member within six months of the date of application.

(b) For purposes of (a)(v) of this subsection (1), a person does not have access to a reasonable choice of plans unless the person has a choice of health maintenance organization or preferred provider organization medicare part C plans offered by at least three different carriers that have had provider networks in the person's county of residence for at least five years. The plan options must include coverage at least as comprehensive as a plan F medicare supplement plan combined with medicare parts A and B. The plan options must also provide access to adequate and stable provider networks that make up-to-date provider directories easily accessible on the carrier web site, and will provide them in hard copy, if requested. In addition, if no health maintenance organization or preferred provider organization plan includes the health care provider with whom the person has an established care relationship and from whom he or she has received treatment within the past twelve months, the person does not have reasonable access.

(2) The following persons are not eligible for coverage by the pool:

(a) Any person having terminated coverage in the pool unless (i) twelve months have lapsed since termination, or (ii) that person can show continuous other coverage which has been involuntarily terminated for any reason other than nonpayment of premiums. However, these exclusions do not apply to eligible individuals as defined in section 2741(b) of the federal health insurance portability and accountability act of 1996 (42 U.S.C. Sec. 300gg-41(b));

1    (b) ((~~Any person on whose behalf the pool has paid out two million~~
2    ~~dollars in benefits;~~

3    ~~(c)~~)) Inmates of public institutions and those persons who become
4    eligible for medical assistance after June 30, 2008, as defined in RCW
5    74.09.010.  However,  these  exclusions  do  not  apply  to  eligible
6    individuals  as  defined  in  section  2741(b)  of  the  federal  health
7    insurance portability and accountability act of 1996 (42 U.S.C. Sec.
8    300gg-41(b));

9    (((~~d~~)) (c) Any person who resides in a county of the state where
10   any carrier or insurer regulated under chapter 48.15 RCW offers to the
11   public  an  individual  health  benefit  plan  other  than  a  catastrophic
12   health plan as defined in RCW 48.43.005 at the time of application to
13   the pool and who does not qualify for pool coverage based upon the
14   results of the standard health questionnaire, or pursuant to subsection
15   (1)(a)(iv) of this section.

16   (3) When a carrier or insurer regulated under chapter 48.15 RCW
17   begins to offer an individual health benefit plan in a county where no
18   carrier had been offering an individual health benefit plan:

19   (a) If the health benefit plan offered is other than a catastrophic
20   health plan as defined in RCW 48.43.005, any person enrolled in a pool
21   plan pursuant to subsection (1)(a)(iii) of this section in that county
22   shall no longer be eligible for coverage under that plan pursuant to
23   subsection (1)(a)(iii) of this section, but may continue to be eligible
24   for  pool  coverage  based  upon  the  results  of  the  standard  health
25   questionnaire designated by the board and administered by the pool
26   administrator.  The pool administrator shall offer to administer the
27   questionnaire to each person no longer eligible for coverage under
28   subsection  (1)(a)(iii)  of  this  section  within  thirty  days  of
29   determining that he or she is no longer eligible;

30   (b) Losing eligibility for pool coverage under this subsection (3)
31   does  not  affect  a  person's  eligibility  for  pool  coverage  under
32   subsection (1)(a)(i), (ii), or (iv) of this section; and

33   (c) The pool administrator shall provide written notice to any
34   person who is no longer eligible for coverage under a pool plan under
35   this  subsection  (3)  within  thirty  days  of  the  administrator's
36   determination that the person is no longer eligible.  The notice shall:
37   (i) Indicate that coverage under the plan will cease ninety days from
38   the date that the notice is dated; (ii) describe any other coverage

1    options, either in or outside of the pool, available to the person;
2    (iii) describe the procedures for the administration of the standard
3    health questionnaire to determine the person's continued eligibility
4    for coverage under subsection (1)(a)(ii) of this section; and (iv)
5    describe the enrollment process for the available options outside of
6    the pool.

7        (4) The board shall ensure that an independent analysis of the
8    eligibility standards for the pool coverage is conducted, including
9    examining the eight percent eligibility threshold, eligibility for
10   medicaid enrollees and other publicly sponsored enrollees, and the
11   impacts on the pool and the state budget.  The board shall report the
12   findings to the legislature by December 1, 2007.

13       **Sec. 16.**  RCW 48.41.140 and 2000 c 79 s 16 are each amended to read
14   as follows:

15       (1) Coverage shall provide that health insurance benefits are
16   applicable to children of the person in whose name the policy is issued
17   including adopted and newly born natural children.  Coverage shall also
18   include necessary care and treatment of medically diagnosed congenital
19   defects and birth abnormalities.  If payment of a specific premium is
20   required to provide coverage for the child, the policy may require that
21   notification of the birth or adoption of a child and payment of the
22   required premium must be furnished to the pool within thirty-one days
23   after the date of birth or adoption in order to have the coverage
24   continued beyond the thirty-one day period.  For purposes of this
25   subsection, a child is deemed to be adopted, and benefits are payable,
26   when the child is physically placed for purposes of adoption under the
27   laws of this state with the person in whose name the policy is issued;
28   and, when the person in whose name the policy is issued assumes
29   financial responsibility for the medical expenses of the child.  For
30   purposes of this subsection, "newly born" means, and benefits are
31   payable, from the moment of birth.

32       (2) A pool policy shall provide that coverage of a dependent,
33   ((unmarried)) person shall terminate when the person becomes
34   ((nineteen)) twenty-six years of age:  PROVIDED, That coverage of such
35   person shall not terminate at age ((nineteen)) twenty-six while he or
36   she is and continues to be both (a) incapable of self-sustaining
37   employment by reason of developmental disability or physical handicap

and (b) chiefly dependent upon the person in whose name the policy is
issued for support and maintenance, provided proof of such incapacity
and dependency is furnished to the pool by the policyholder within
thirty-one days of the dependent's attainment of age ((nineteen))
twenty-six and subsequently as may be required by the pool but not more
frequently than annually after the two-year period following the
dependent's attainment of age ((nineteen)) twenty-six.

**Sec. 17.** RCW 48.21.157 and 2007 c 259 s 20 are each amended to
read as follows:
Any group disability insurance contract or blanket disability
insurance contract that provides coverage for a participating member's
dependent must offer each participating member the option of covering
any ((unmarried)) dependent under the age of ((twenty-five)) twenty-
six.

<u>NEW SECTION.</u> **Sec. 18.** A new section is added to chapter 48.43 RCW
to read as follows:
Health care sharing ministries are not health carriers as defined
in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes
of this section, "health care sharing ministry" has the same meaning as
in 26 U.S.C. Sec. 5000A.

<u>NEW SECTION.</u> **Sec. 19.** Sections 10 through 12 of this act take
effect January 1, 2012.

Passed by the Senate April 14, 2011.
Passed by the House April 9, 2011.
Approved by the Governor May 11, 2011.
Filed in Office of Secretary of State May 11, 2011.

Exhibit F

# FINAL BILL REPORT
# ESSB 5122

**C 314 L 11**
Synopsis as Enacted

**Brief Description**:  Making the necessary changes for implementation of the affordable care act in Washington state.

**Sponsors**:  Senate Committee on Health & Long-Term Care (originally sponsored by Senators Keiser and Kline; by request of Insurance Commissioner).

**Senate Committee on Health & Long-Term Care**
**House Committee on Health Care & Wellness**

**Background**:  The federal Patient Protection and Affordability Care Act (PPACA), passed in March 2010, includes a number of provisions that impact medical insurance plans or insurance carriers.  A number of provisions have early implementation dates, some are effective for policies issued on or after September 23, 2010.

The state insurance statutes codified in Title 48 RCW, which apply to regulated insurance carriers, need modification to reflect the federal requirements that are in place now.  The early implementation insurance changes include extending coverage to dependents to age 26 for all plans that offer dependent coverage; elimination of lifetime benefit maximums; prohibition of rescission of coverage; elimination of pre-existing condition waiting period for persons under 19; coverage changes for emergency services; enhanced consumer information including appeals requirements; and reporting of medical loss ratios (the percent of premium spent on medical expenses) with a requirement for rebates to enrollees triggered by certain medical loss ratios.

**Summary**:  The state insurance statutes are modified to reflect the PPACA insurance provisions with early implementation.  Coverage for dependents is extended to age 26.  Lifetime benefit maximums are removed.  Policies for persons under 19 may not include pre-existing condition exclusions.

Federal definitions are inserted for adverse benefit determination, final external review decision, and final internal adverse benefit determination and grandfathered health plan.

The grievance process required for each plan may reflect differences for grandfathered health plans and approval of HHS.

_This analysis was prepared by non-partisan legislative staff for the use of legislative members in their deliberations. This analysis is not a part of the legislation nor does it constitute a statement of legislative intent._

Independent reviews of appeals must be completed by an organization that does not have a conflict of interest. Enrollees must have at least five business days to submit additional information to the independent review organization. The independent review organization must forward any additional information within one business day. A benefit decision must be provided within 45 days of the request for external review. Expedited review must be completed within 72 hours.

The rate information for individual health benefit plans is modified to remove the calculation of the remittance to the high risk pool that is based on the declination rate (rate of declining applicants due to health screening), to ensure health insurance carriers do not pay the current remittance and the new federal rebate to enrollees that is triggered if the individual plan's medial loss ratio is less than 80 percent. The remittance calculation is removed effective January 1, 2012.

Changes are made for the Washington State Health Insurance Pool (WSHIP), removing the lifetime maximum on benefits of $2 million, extending dependents eligibility to age 26, and allowing the pool to waive the recertification of the standard health questionnaire and the rebidding of the pool if the program is discontinued during the 36-month review cycle.

Health care sharing ministries are not health carriers or insurers under our state insurance laws, and must follow the definition of health care sharing ministries provided in federal law in the Internal Revenue Code (26 USC Sec 5000A).

**Votes on Final Passage:**

| | | | |
|---|---|---|---|
| Senate | 45 | 4 | |
| House | 63 | 32 | (House amended) |
| Senate | 44 | 2 | (Senate concurred) |

**Effective:** July 22, 2011.

**Exhibit G**

# HOUSE BILL REPORT
# ESSB 5122

**As Passed House:**
April 9, 2011

**Title**:  An act relating to changes for implementation of the affordable care act in Washington state.

**Brief Description**:  Making the necessary changes for implementation of the affordable care act in Washington state.

**Sponsors**:  Senate Committee on Health & Long-Term Care (originally sponsored by Senators Keiser and Kline; by request of Insurance Commissioner).

**Brief History:**
　　**Committee Activity:**
　　　　Health Care & Wellness:  3/17/11, 3/21/11 [DP].
　　**Floor Activity:**
　　　　Passed House:  4/9/11, 63-32.

+-------------------------------------------------------------+
| **Brief Summary of Engrossed Substitute Bill**              |
|                                                             |
| • Makes changes to various health insurance provisions in   |
|   light of federal health care reform.                      |
+-------------------------------------------------------------+

## HOUSE COMMITTEE ON HEALTH CARE & WELLNESS

**Majority Report**:  Do pass.  Signed by 9 members:  Representatives Cody, Chair; Jinkins, Vice Chair; Schmick, Ranking Minority Member; Hinkle, Assistant Ranking Minority Member; Clibborn, Green, Kelley, Moeller and Van De Wege.

**Minority Report**:  Do not pass.  Signed by 2 members:  Representatives Bailey and Harris.

**Staff**:  Jim Morishima (786-7191).

**Background**:

In 2010 Congress passed, and the President signed, the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 (PPACA).  Many of

_____

*This analysis was prepared by non-partisan legislative staff for the use of legislative members in their deliberations. This analysis is not a part of the legislation nor does it constitute a statement of legislative intent.*

the PPACA's provisions do not go into effect until 2014. However, several health insurance-related provisions, and the administrative rules implementing them, have already gone into effect or will go into effect in the near future. These provisions include:

- minimum medical loss ratios;
- the removal of pre-existing condition exclusions for children under the age of 19;
- the removal of lifetime maximums;
- internal and external review processes;
- mandatory coverage for emergency services;
- dependent coverage until age 26; and
- mandated coverage for preventive services.

I. Medical Loss Ratios.

A. Medical Loss Ratios Under Federal Law.

A medical loss ratio is the amount that a health insurer must spend on health care as opposed to overhead and other expenses. Under the PPACA, health insurers in the large group market must maintain a minimum 85 percent medical loss ratio. Insurers in the small group and individual markets must maintain a minimum 80 percent medical loss ratio. A health insurer that does not meet the minimum medical loss ratios must provide a rebate to each of its enrollees.

B. Medical Loss Ratios and the Washington State Health Insurance Pool.

The Washington State Health Insurance Pool (WSHIP) provides health insurance to individuals who have been rejected from the individual market based on the Standard Health Questionnaire. The WSHIP is funded, in part, by remittances that health insurers must make if their medical loss ratios are less than an amount between 74 and 77 percent (the applicable medical loss ratio is dependent on an individual insurer's declination rate).

II. Preexisting Condition Exclusions.

A. Preexisting Condition Exclusions Under Federal Law.

The PPACA currently prohibits health insurers from imposing preexisting condition exclusions on persons under the age of 19. Beginning in 2014, this prohibition will apply to all consumers.

B. Preexisting Condition Exclusions Under State Law

Generally, health insurers who offer conversion contracts or policies, i.e., a contract or policy that converts group coverage to individual coverage, may not exclude preexisting conditions. However, a preexisting condition exclusion is allowed to the extent that any waiting period in the original group coverage for a preexisting condition has not been satisfied.

III. Lifetime Maximums.

A. Lifetime Maximums Under Federal Law.

Under the PPACA, health insurers may not impose lifetime benefit maximums.

B.  Lifetime Maximums Under State Law.

A group or blanket disability insurer who offers a conversion policy must offer at least three policy benefit plans:
- a major medical plan with a lifetime benefit maximum of $250,000 per person;
- a comprehensive medical plan with a lifetime benefit maximum of $500,000 per person; and
- a basic medical plan with a lifetime benefit maximum of $75,000 per person.

Individuals participating in the WSHIP are not eligible for coverage once the WSHIP has paid out $2 million in benefits.

IV.  Internal and External Review Procedures.

A.  Internal and External Review Procedures Under Federal Law.

1.  Internal Review.

Under the PPACA, health insurers must have an effective internal appeals process for appeals of coverage determinations and claims.  Enrollees must be informed of the appeals process in a culturally and linguistically appropriate manner.  Enrollees must also be informed of any applicable office of health insurance consumer assistance or ombudsman established under the federal Public Health Service Act.

Notice of an adverse benefit determination must contain the following information:
- information sufficient to identify the claim involved, including the date of service, the health care provider, the claim amount (if applicable), the diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning; and
- the reason or reasons for the adverse benefit determination or final internal adverse benefit determination, including the denial code and its corresponding meaning, as well as a description of the issuer's standard, if any, that was used in denying the claim.  In the case of a notice of final internal adverse benefit determination, this description must include a discussion of the decision.

2.  External Review.

The PPACA also requires health insurers to comply with applicable state external review processes that contain at least the protections in the Uniform External Review Model Act promulgated by the National Association of Insurance Commissioners.  Additionally, the federal rules adopted to implement the PPACA require the external review process to meet the following criteria:
- The independent review organization (IRO) involved in the review may not have any conflicts of interest.

- Claimants must be provided with at least five business days to submit additional information to the IRO, which the IRO must forward to the carrier within one business day.
- The IRO must provide notice of its decision within 45 days of the request for external review.
- An expedited review process must be available for determinations regarding admissions, availability of care, continued stay, health care services for which the claimant received emergency services, but has not been discharged, or medical conditions for which a 45-day wait would jeopardize the life, health, or function of the claimant. The IRO must provide notice of its decision within 72 hours. If the notice is not in writing, the notice must be followed by written confirmation within 48 hours.
- With respect to claims involving experimental or investigational treatments, the IRO must provide protections to ensure that adequate clinical and scientific experience and protocols are taken into account as part of the external review process.
- The IRO must maintain written records that are available to the state.

B. Internal and External Review Procedures Under State Law.

1. Internal Review.

Every health insurer must have a fully operational, comprehensive grievance process. An insurer must respond to an enrollee's dissatisfaction about customer service or health service availability in a timely and thorough manner. Enrollees must be provided with written notice of decisions to deny, modify, reduce, or terminate payment, coverage, authorization, or provision of health care services or benefits. Appeals of adverse decisions must be processed within 30 days (or 72 hours if the 30-day timeline could seriously jeopardize the enrollee's life, health, or function). An insurer must make its grievance process accessible to enrollees who are limited English speakers, have disabilities, or have physical or mental disabilities.

2. External Review.

Once a health insurer's grievance process has been exhausted, the enrollee may seek review by an IRO. The Office of the Insurance Commissioner maintains a rotational registry for the assignment of an IRO to each dispute. The IRO may override the insurer's medical necessity or appropriateness standards if the standards are unreasonable or inconsistent with sound, evidence-based medical practice.

<u>V. Emergency Services</u>.

A. Emergency Services Under Federal Law.

Under the Emergency Medical Treatment and Active Labor Act (EMTALA), which was passed by Congress in 1986, a hospital may not turn away a patient who comes to the emergency department with an emergency medical condition. The hospital must screen and evaluate the patient and provide treatment necessary to stabilize him or her.

Under the PPACA, a health insurer that offers coverage for services in an emergency department must cover emergency services without prior authorization, without regard to whether the provider is in-network or out-of-network, and with no differential copayments or coinsurance for out-of-network services. The services must be provided without regard to any other term or condition of coverage other than applicable cost sharing or federally authorized waiting periods or exclusion or coordinated benefits.

For purposes of the PPACA and the EMTALA, "emergency medical condition" is defined as a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

- placing the health of the individual (or, in the case of a pregnant woman, her unborn child) in serious jeopardy;
- serious impairment to bodily functions; or
- serious dysfunction of any body organ or part.

B. Emergency Services Under State Law.

A health carrier must cover emergency services (services medically necessary to evaluate and treat an emergency medical condition provided in a hospital's emergency department) necessary to screen and stabilize a covered person without prior authorization if a prudent layperson would reasonably have believed that an emergency medical condition existed. If the emergency services were provided in a non-participating hospital, the health carrier must cover emergency services necessary to screen and stabilize a covered person if a prudent layperson would reasonably have believed that use of a participating hospital would result in a delay that would worsen the emergency or if use of a specific hospital is required by federal, state, or local law. Likewise, a health carrier may not require prior authorization of emergency services in a non-participating hospital if a prudent layperson acting reasonably would have believed that an emergency medical condition existed and that use of a participating hospital would result in a delay that would worsen the emergency.

If an authorized representative of the health carrier authorizes coverage for emergency services, the carrier may not retract the authorization after the services have been provided or reduce payment for services provided in reliance on the approval. The carrier may retract the authorization or reduce payment, however, if the approval was based on a material misrepresentation about the covered person's health condition made by the provider.

Coverage of emergency services may be subject to applicable copayments, coinsurance, and deductibles. A health carrier may also impose reasonable differential cost-sharing arrangements for emergency services rendered by non-participating providers. However, the difference between cost-sharing amounts for participating and non-participating providers may not exceed $50. Differential cost-sharing may not be applied when a covered person utilizes a non-participating hospital emergency department when the carrier requires pre-authorization for post-evaluation and post-stabilization emergency services if:

- the covered person was unable to go to a participating hospital in a timely fashion without serious impairment to the person's health due to circumstances beyond the person's control; or

- a prudent layperson possessing an average knowledge of health and medicine would have reasonably believed that the person would be unable to go to a participating hospital in a timely fashion without serious impairment to the person's health.

"Emergency medical condition" is defined as the emergent and acute onset of a symptom or symptoms, including severe pain, that would lead a prudent layperson acting reasonably to believe that a health condition exists that requires immediate medical attention, if failure to provide medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health in serious jeopardy.

VI.  Dependent Coverage to Age 26.

A.  Dependent Coverage Under Federal Law.

Under the PPACA, if a health insurer offers dependent coverage, a child may stay on the parent's plan until age 26, unless the child's employer offers health insurance.

B.  Dependent Coverage Under State Law.

Health insurers who offer dependent coverage must offer the option of covering any unmarried dependent under the age of 25.  Health insurers participating in the WSHIP must terminate coverage for unmarried dependents at age 19.

VII.  Preventive Services.

A.  Preventive Services Under Federal Law.

Under the PPACA, group or individual health insurers must provide coverage with no cost sharing requirements for a variety of preventive health services, including:
- immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention;
- with respect to infants, children, and adolescents, evidence-informed preventive care and screening provided in the comprehensive guidelines supported by the Health Resources and Services Administration;
- with respect to women, additional preventive care and screenings provided in the comprehensive guidelines supported by the Health Resources and Services Administration; and
- evidence-based recommendations rated "A" or "B" in the current recommendations of the United States Preventive Services Task Force (USPSTF), which include tobacco use counseling and interventions.

B.  Preventive Services Under State Law.

Conversion agreements may contain provisions requiring reasonable deductibles and copayments.  There is currently no exemption to this option for preventive services.

VIII.  Health Care Sharing Ministries.

Federal law defines "health care sharing ministry" as an organization:
- that is tax-exempt;
- the members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the state in which a member resides or is employed;
- the members of which retain membership even after they develop a medical condition;
- that has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999; and
- that conducts an annual audit performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and made available to the public upon request.

**Summary of Bill**:

I.  Medical Loss Ratios.

Provisions requiring health insurers to remit amounts to the WSHIP based on medical loss ratios are eliminated.

Exceptions are made to provisions regarding updating the Standard Health Questionnaire and selecting the new administrator for the WSHIP in the event the WSHIP will be discontinued.

II.  Preexisting Condition Exclusions.

Conversion contracts and conversion policies may not contain exclusions for preexisting conditions for any applicant who is under the age of 19.

III.  Lifetime Maximums.

Lifetime benefit maximums for conversion policies offered by group or blanket disability insurers are eliminated.  The $2 million limit for persons participating in the WSHIP is eliminated.

IV.  Internal and External Review Procedures.

A.  Internal Review.

When adopting rules on internal grievance processes, the Insurance Commissioner must consider grievance processes as approved by the federal Department of Labor and Human Services or the federal Department of Labor (unless the health plans are grandfathered).

B.  External Review.

The following changes are made to the IRO process:
- An IRO involved in a review may not have any conflicts of interest.

- Enrollees must be provided with at least five business days to submit additional information to the IRO, which the IRO must forward to the carrier within one business day.
- An expedited review process must be available for determinations regarding admissions, availability of care, continued stay, health care services for which the claimant received emergency services, but has not been discharged, or medical conditions for which a 45-day wait would jeopardize the life, health, or function of the claimant. The IRO must provide notice of its decision within 72 hours. If the notice is not in writing, the notice must be followed by written confirmation within 48 hours.
- With respect to claims involving experimental or investigational treatments, the IRO must provide protections to ensure that adequate clinical and scientific experience and protocols are taken into account as part of the external review process.
- The IRO must maintain written records that are available to the state.
- The Insurance Commissioner must consider standards adopted by the National Association of Insurance Commissioners when promulgating rules regarding IROs.

V.  Emergency Services.

The definition of "emergency services" is changed to reflect the definition in the EMTALA and the PPACA; i.e., services necessary to screen, evaluate, and stabilize the patient.

The definition of "emergency medical condition" is changed to reflect the definition in the EMTALA and the PPACA; i.e., a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in a condition:
- placing the health of the individual, or with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy;
- serious impairment to bodily functions; or
- serious dysfunction of any bodily organ or part.

VI.  Dependent Coverage to Age 26.

Health insurers who offer dependent coverage must offer the option of covering any dependent under the age of 26.  Health insurers in the WSHIP must terminate dependent coverage at age 26.

VII.  Preventive Services.

Conversion agreements may not require deductibles or copayments for preventive services.

VIII.  Health Care Sharing Ministries.

Health care sharing ministries are exempt from the definition of "insurer" or "health carrier" for purposes of the statutes that regulate insurance.

**Appropriation**:  None.

**Fiscal Note**:  Available on original bill.

**Effective Date**:  The bill takes effect 90 days after adjournment of session in which the bill is passed, except for sections 10 through 12, dealing with remittances to the Washington State Health Insurance Pool, which take effect January 1, 2012.

**Staff Summary of Public Testimony**:

(In support) This bill harmonizes state law with federal law.  The bill aligns administrative details of Washington's state statutes with federal requirements; e.g., federal law requires dependent coverage to age 26, but Washington requires coverage to age 25.

(Opposed) None.

**Persons Testifying**:  Senator Keiser, prime sponsor.

**Persons Signed In To Testify But Not Testifying**:  None.

Exhibit H

# STATE OF WASHINGTON



## OFFICE OF
## INSURANCE COMMISSIONER

In the Matter of

SAMARITAN MINISTRIES INTERNATIONAL,
SAMARITAN MV, SAVE TO SHARE, and
CHRISTIAN HEALTH CARE NEWSLETTER,

        Unauthorized Entities,

and

TED PITTENGER, ERIC ACKERMAN, KEN
REUTTER, JONATHAN BEN-EZRA, ROBERT
STEWART, JED STUBER, SETH BEN-EZRA,
CAMERON EASLEY, RICHARD DRIGGERS,
BRYAN EVANS, ANTHONY HOPP, DeWAYNE
ARINGTON, JAMES LANSBERRY, JOHN
CHANEY, JAMIE PYLES, STEVE McHUGH,
RAY KING, WILLIAM KURTH, FRANK LEWIS,
KARI LEWIS,

        Principals.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

No. 11-0075

ORDER TO CEASE AND DESIST

To: The above Respondents

    Samaritan Ministries
    PO Box 3618
    Peoria, IL 61612

    Via e-mail to:

    smchcn@smchcn.net

Pursuant to RCW 48.02.080, 48.30.010 and RCW 48.42.010 - 050, the Office of the
Insurance Commissioner ("OIC") orders Samaritan Ministries International, Samaritan MV,
Save To Share, and Christian Health Care Newsletter, Ted Pittenger, Eric Ackerman, Ken
Reutter, Jonathan Ben-Ezra, Robert Stewart, Jed Stuber, Seth Ben-Ezra, Cameron Easley,
Richard Driggers, Bryan Evans, Anthony Hopp, Dewayne Arington, James Lansberry, John
Chaney, Jamie Pyles, Steve McHugh, Ray King, William Kurth, Frank Lewis, Kari Lewis, their

officers, directors, trustees, agents, and affiliates ("Respondents") to immediately cease and desist from:

A. engaging in the unauthorized business of insurance in the state of Washington, which includes operating or participating in a system or program such as those described as "needs sharing" or involving organizing the transfer of money from people to pay the health care or property/casualty needs of others;

B. involving any Washington resident in such a system or program;

C. soliciting, advertising, seeking, pursuing, obtaining or continuing any insurance business in the state of Washington, which includes a system or program such as those described in subsection "A" of this Order;

D. soliciting Washington residents to induce them to participate in any system or program such as those described in subsection "A" of this Order;

E. representing to Washington residents that Respondents are offering any system or program such as those described in subsection "A" of this Order that is exempt from regulation by the OIC;

F. representing to Washington residents that Respondents are offering a health plan or policy, or coverage of any of the types listed in RCW 48.42.010, that is exempt from regulation by the OIC unless and until Respondents demonstrate to the OIC's satisfaction that the Respondents are subject to the jurisdiction and regulation of another agency of this state, any subdivision thereof, or the federal government, including the U.S. Department of Labor as required by RCW 48.42.010;

G. offering a health plan or policy, or coverage of any of the types listed in RCW 48.42.010, that has not been approved by the OIC until Respondents demonstrate to the OIC's satisfaction that the Respondents are subject to the jurisdiction and regulation of another agency of this state, any subdivision thereof, or the federal government, including the U.S. Department of Labor as required by RCW 48.42.010;

H. offering a health plan or policy, or coverage of any of the types listed in RCW 48.42.010 without submitting to examination by the Insurance Commissioner to determine the organization and solvency of the person or the entity, and to determine whether or not such person or entity complies with the applicable provisions of the Insurance Code as required by RCW 48.42.030 and RCW 48.42.040;

I. offering a health plan or policy, or coverage of any of the types listed in RCW 48.42.010, where the coverage is not fully insured or otherwise fully covered by Washington admitted life or disability insurers or health care service contractors or health maintenance organization agreements and where every purchaser, prospective purchaser, and covered person has not been advised of the lack of insurance or other coverage as required by RCW 48.42.050;

J. offering a health plan or policy, or coverage for medical expenses, or a property/casualty plan or policy, or coverage for motor vehicle-related expenses, without being authorized by a Certificate of Authority issued to it by OIC and then in force as required by RCW 48.05.030, except as otherwise provided for in the Washington Insurance Code, including compliance with all requirements of Chapter 48.05 RCW;

K. offering a health plan or policy, or coverage for medical expenses, or a property/casualty plan or policy, or coverage for motor vehicle-related expenses, without having filed and received OIC approval of both its rates and its forms as required under Chapter 48.18 and 48.19 RCW; and

L. Operating as an assessment mutual insurer for health insurance in violation of RCW 48.06.020.

THIS ORDER IS BASED ON THE FOLLOWING:

1. Samaritan Ministries International is a non-profit corporation domiciled in Illinois. Save to Share, Samaritan MV, and Christian Health Care Newsletter are apparently programs, divisions, or other sub-units of Samaritan Ministries International. The individually-named Respondents are believed to be principals, board members, and/or employees of Samaritan Ministries International, based upon the Company's representations on its website, www.samaritanministries.org.

2. Respondents operate an enterprise they term a "needs sharing ministry," which involves the organization of the transfer of money from its "members" to pay the health care or property/casualty needs of other "members." The property/casualty aspect of the enterprise appears to be limited to coverage of medical costs resulting from motor vehicle accidents.

3. Respondents describe the health care aspect of their enterprise as follows:

   Samaritan Ministries publishes a monthly newsletter mailing that reports the total Shares and Needs and includes an individualized Share Notice for each member household. The Share Notice tells each household how to pray for a specific member with a Need and what his address is, so the Share can be sent to him. Typically less than 10 percent of the members have a Need in a given month and are receiving Shares.

   When a member has a health care "Need" he receives health care treatment from a provider of his choice, collects the bills, and sends them to Samaritan Ministries. Samaritan Ministries verifies that the Need meets the Guidelines. Then, in the monthly newsletter mailing, Samaritan Ministries directs some members to send their Shares to the member with the Need. The member with the need receives the shares to pay his health care bills.

   Reprinted from WWW.samaritan ministries.org

4.  They describe the property/casualty aspect of their enterprise as follows:

    Most medical needs from accidents involving most motorized vehicles are
    not publishable in the basic ministry. Members who would like to share in
    these needs have the option of joining *SamaritanMV*™. These members
    share an additional amount each month based on their family size (see
    chart below) in order to share in medical needs that have resulted from
    motor vehicle accidents.
    *Id.*

5.  This enterprise appears to be engaged in the unauthorized business of insurance in the
    state of Washington.

6.  This enterprise is engaged in the business of both health care and property/casualty
    insurance and claims to have "members" in all 50 states. The OIC has information
    regarding at least one Washington resident who was a "member" of Samaritan Ministries
    International.

7.  The website SamaritanMinistries.org demonstrates that Respondents are aware that this
    system or program is insurance and that it is illegal in at least several, if not all, States
    absent compliance with the States' insurance laws.

8.  Respondents' knowing and willful engagement in the unauthorized business of insurance
    in Washington endangers Washington residents by enticing them to forego legal
    insurance coverage through false assurance that their medical bills will be paid. It
    deprives Washington residents of the multitude of rights and consumer protection
    mechanisms provided under the Washington Insurance Code. It defrauds the State of
    Washington of premium tax monies to which it is entitled. It institutionalizes
    discrimination of several prohibited types.

9.  Chapter 48.42 RCW provides that any person or other entity which provides coverage in
    this state for medical, surgical, chiropractic, physical therapy, speech pathology,
    audiology, professional mental health, dental, hospital, or optometric expenses, whether
    the coverage is by direct payment, reimbursement, the providing of services, or
    otherwise, shall be subject to the authority of the state   Insurance Commissioner,
    unless the person or other entity shows that while providing the services it is subject to
    the jurisdiction and regulation of another agency of this state, any subdivisions thereof, or
    the federal government. The chapter's various subsections set forth requirements for
    entities to prove such regulation and to operate in Washington under such regulation.

10. Chapter 48.05 RCW prohibits an entity from offering insurance products in Washington
    without being authorized by a Certificate of Authority issued to it by OIC and then in force
    as required by RCW 48.05.030, except as otherwise provided for in the Washington
    Insurance Code. The subsections of the chapter include several requirements for
    authorization and maintenance thereof.

11. Chapters 48.18 and 48.19 RCW prohibit an entity from offering the types of coverage offered by Respondents, without having filed and received OIC approval of both its rates and its forms.

12. Respondents have violated the above-cited provisions by acting as an unauthorized insurer in this state and issuing and delivering to Washington residents insurance products, the rates and forms for which have not been filed, and the provisions of which violate multiple provisions of the Insurance Code.

Any violation of the terms of this Order by Respondents, their officers, directors, agents, or affiliates, will render the violator(s) subject to the full penalties authorized by the Washington Insurance Code.

Respondents have the right to demand a hearing pursuant to chapters 48.04 and 34.05 RCW. This Order shall remain in effect subject to the further order of the Commissioner.

THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED at Tumwater, Washington, this _1st_ day of April, 2011.

MIKE KREIDLER
Insurance Commissioner

By: _Andrea L. Philhower_
    Andrea L. Philhower
    Legal Affairs Division
    Office of Insurance Commissioner
    State of Washington

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the State of Washington as follows:

I am now and at all times herein mentioned have been a citizen of the United States and a resident of the State of Washington. I am over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein. On the date given below I caused to be served the foregoing ORDER TO CEASE AND DESIST on the following individuals via US Mail and e-mail.

Samaritan Ministries
PO Box 3618
Peoria, IL 61612

And via e-mail to:

smchcn@smchcn.net

**SIGNED** this _1st_ day of April, 2011, at Tumwater, Washington.

*Christine Tribe*
Christine Tribe

Exhibit I

# STATE OF WASHINGTON
## OFFICE OF THE INSURANCE COMMISSIONER

| | |
|---|---|
| *In the Matter of* | Order No.    20-0335 |
| **ALLIANCE FOR SHARED HEALTH,** | ORDER TO CEASE AND DESIST |
| Unauthorized Entity/Respondent. | |

Pursuant to RCW 48.02.080, RCW 48.15.023 and RCW 48.44.016, the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A.  Acting as an insurer in the state of Washington;

B.  Acting as a health care service contractor in the state of Washington;

C.  Engaging in or transacting the unauthorized business of insurance in the state of Washington;

D.  Seeking, pursuing, and obtaining any insurance business in the state of Washington;

E.  Soliciting Washington residents to purchase any insurance to be issued by an unauthorized insurer; and

F.  Soliciting Washington residents to induce them to purchase any insurance contract.

## BASIS:

1.      Alliance for Shared Health Inc. ("ASH") is a non-profit 501(c)(3) corporation headquartered in Missouri. In September 2019, ASH filed an Application for a Certificate of Authority of a Foreign Non-Profit Corporation with the Missouri Secretary of State.

2.      ASH does not hold a certificate of authority to transact insurance in Washington. ASH is also not registered with the Washington Secretary of State or the Washington State Department of Revenue.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

3.     ASH was originally incorporated in the U.S. Virgin Islands in June 2017. ASH provided the Insurance Commissioner's Regulatory Investigations Unit ("Investigations") with ASH's Internal Revenue Service ("IRS") non-profit organization filings. ASH submitted an application for non-profit status to the IRS in November 2018. The filings list the following ASH executive officers: Corey Durbin ("Durbin"), *President*; John Lewis ("Lewis"), *Treasurer*; and Leslie Hunsel ("Hunsel"), *Secretary*.

4.     Christian Discount Alliance, LLC, dba Shared Health Alliance ("SHA"), is a business entity insurance producer licensed in Missouri since 2016. The Designated Licensed Responsible Producers for SHA's Missouri insurance producer license are also Durbin, *President, Owner*; Lewis, *Chief Operating Officer, Owner*; and Hunsel, *Secretary*. None of these individuals hold an insurance producer license in Washington. Durbin was previously licensed as a producer in Washington (WAOIC No. 255411). In October 2015, SHA registered with the Missouri Secretary of State as a limited liability company.

5.     SHA is not licensed as an insurance producer in Washington or any other state. SHA is not registered with the Washington Secretary of State. SHA registered with the Washington Department of Revenue in February 2018 with the business designation of "insurance agencies and brokerages."

6.     ASH refers to SHA as its "vendor consultant." ASH and SHA entered a vendor consulting agreement, effective January 1, 2019. ASH explained to Investigations that SHA "offers non-insurance solutions to help strengthen the ASH sharing programs" including "Rx Advocacy for high cost maintenance medications... 24/7/365 Telemedicine... Virtual Primary Care... National Lab Program... Discount Rx Card... Provider Discounts... Member Support Services..."

7.     The Office of the Insurance Commissioner opened an investigation to determine if 1) ASH meets the statutory definition of a Health Care Sharing Ministry ("HCSM") under Washington law and Federal law and 2) if ASH is not a bona fide HCSM, whether ASH is acting as an unauthorized insurer in Washington.

8.     ASH represents itself as a HCSM. HCSMs are exempt from the Affordable Care Act ("ACA") individual mandate.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

2

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

*ASH does not meet the legal definition of a HCSM.*

9.      To qualify as a health care sharing ministry under the IRS and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. A HCSM must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

10.     ASH has not been in operation and continuously sharing health care costs since 1999.

11.     ASH acknowledges that it does not meet the statutory requirements for an HCSM because it was not incorporated until June 2017.

12.     ASH stated to Investigations: "[ASH] was not originally formed, nor does it warrant that it meets the original ACA grandfathering clause to qualify its members for the exemption to the individual mandate under federal law." ASH provided the following explanation:

> While ASH was originally formed in 2017, Hurricane Irma delayed the initial roll-out. As mentioned above, ASH as a health share solution was designed to help meet needs that the other health share programs were not/are not meeting - and do so without pre-existing condition limitations. However, participation in ASH was not available until 2019. There was no intention to introduce ASH until such time as the Federal Mandate was not being enforced - which began in January 2019. ASH did not want any participant to think that ASH alone met the ACA individual mandate. When the mandate was removed (or at least it was announced that the mandate would not be enforced at the Federal level beginning in 2019), ASH felt comfortable offering participation per the approval of the IRS as a bona fide 501(c)(3).

13.     During the course of the investigation of ASH, Investigations conducted a review of ASH's website.

14.     As of May 29, 2019, ASH's "About Us" webpage stated the following:

> Alliance for Shared Health was formed to provide "health sharing" access to Americans of any faith persuasion. When Americans come together to meet challenges, there is little we can't accomplish together... Alliance for Shared Health is a non-profit health sharing community that seeks to provide a way for its members to access specific medical needs outside of expensive, traditional health insurance. All members must agree with and attest to the statement of standards developed by the Board of ASH...

15.     Additionally, ASH listed the following statement of standards:

> I believe that traditional health care does not work for me anymore, and want to be a part of a moral, ethical and health-conscious community of people that shares in medical needs under the ASH Guidelines

I affirm that I understand ASH is not an insurance company but rather a non-profit benevolence organization. ASH members have committed to paying a monthly contribution in order to help share in medical expenses under the guidelines.

I do understand that ASH is not a guarantee of payment, but that ASH intends to share in the medical needs per the ASH guidelines and the sharing level selected by me.

I desire to live a healthy lifestyle and make good health decisions to be positive member of the ASH community.

I agree to refrain from the usage of any form of illegal substances and that if I do engage in use of these, any medical needs caused by or related to such shall not be eligible for sharing.

I agree to submit to mediation followed by arbitration, if needed, should a dispute arise with ASH or its affiliates. As such, I understand that ASH is not an insurance company and will not file any complaints with my state insurance department if I have a dispute on a medical need.

I agree that whether or not I sign and submit this form, submitting my application for membership in ASH is equivalent to attesting to this statement of beliefs.

(Emphasis added.) Since the Insurance Commissioner's investigation, ASH has made changes to its website and statement of standards.

*ASH is acting as an unauthorized insurer in the state of Washington.*

16.     Because ASH is not qualified as a HCSM, it is acting as an unauthorized insurer. ASH has denied acting as an unauthorized insurer. ASH asserts it has never intended to operate as an insurer and stated it includes "all appropriate disclaimers and notifications on its materials including its website, enrollment portal, sharing guidelines, and member identification cards." ASH further asserts it is operating similarly to other health sharing entities, which are not considered insurers under state or federal law.

17.     In ASH's response to Investigation, it states:

[ASH] helps its members access preventive care (the same preventive care codes that the Affordable Care Act ("ACA") mandate included), as well as virtual primary care - including the diagnosis and treatment of over 1,500 conditions - all at one member responsibility amount per episode of care – again with no pre-existing condition limitations and shareable at 100%.

18.     ASH's member guidelines discuss benefit levels as "plans" and require a set monthly contribution to maintain membership. One of ASH's member guidelines discusses four "Sharing Level" plans: Allied Basic, Allied Visit, Allied Core, and Allied Max. ASH's guidelines

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335

LA - 1602799 - 1

4

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

state: "Make your choice wisely, because different programs offer different levels of health cost sharing support."

19.    In describing the four plans, discussed above, ASH explains:

ASH shares 100 percent of bills for any medical incident exceeding the MRA (Member Responsibility Amount) as long as all other Guidelines are met and funds are available for sharing up to the agreed upon Referenced Based-Pricing Allowances for that service as agreed upon by the ASH Community. Any medical expense less than the MRA per incident is the member's responsibility.

20.    One of ASH's guidelines includes a table which shows what medical care and services are covered by each of the four plans, such as "Preventive Care", "Doctor Access", "Virtual Primary Care", "PCP Visits", "Outpatient Lab", "Daily Hospital Allowance", and "Prescription Drugs…Tier 1… Tier 2…Tier 3… Specialty Drugs".

21.    Another one of ASH's guidelines discusses three other plans: "SHA Premier", "SHA Preventative", and "SHA Scripts". The guidelines include a table which shows what medical care and services are covered by each of the three plans, such as "Preventive Care", "Doctor Access", "Telemedicine", "Virtual Primary Care", "PCP Visits", "Specialist", "Urgent Care", "Diagnostic X-Ray and Lab", "Cat-Scan/MRI", "Outpatient Testing", and "Prescription Drugs…Tier 1…Tier 2…Tier 3…Specialty Drugs". The guidelines of these plans also include tables regarding coverage for "Preventive Care Services" and "Preventive Immunizations".

22.    Other plans provided by ASH include similar member guidelines and tables as to the ones discussed.

23.    ASH also sells plans to Washington members that provide members with access to a network of providers, called "First Health." ASH provides members with "access to providers in the First Health network – A national PPO network, with more than 5,000 hospitals, over 90,000 ancillary facilities and over 1 million health care professional service locations." According to ASH, "access is wide-ranging – more than 96 percent of people in the United States are within 20 miles of a network provider." ASH's member guidelines discuss First Health, as well as include information about First Health's provider locator assistance toll-free number and First Health's provider locator website.

24.    ASH provided a spreadsheet to Investigations showing ASH sold a variety of plans to Washington consumers. ASH sold twelve (12) different plans to a total of 1,411 Washington consumers and collected $237,188.27.

25.    RCW 48.01.040 states that "insurance" is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.

26.    RCW 48.01.050 states in relevant part that "insurer" as used in this code includes every person engaged in the business of making contracts of insurance.

27.    RCW 48.01.060 defines insurance transaction as including any solicitation, negotiations preliminary to execution, execution of an insurance contract, transaction of matter subsequent to execution of the contract and arising out of it, and insuring.

28.    RCW 48.43.009 provides that health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes of this section, "health care sharing ministry" has the same meaning as in 26 U.S.C. Sec. 5000A.

29.    26 U.S.C. Sec. 5000A states the term "health care sharing ministry" means an organization—

(I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(III) members of which retain membership even after they develop a medical condition,

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

30.    RCW 48.05.030(1) states no person shall act as an insurer and no insurer shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the Insurance Commissioner and then in force; except as to such transactions as are expressly otherwise provided for in this code.

31.    RCW 48.44.015(1) provides that a person may not in this state, by mail or otherwise, act as or hold himself or herself out to be a health care service contractor, as defined in RCW 48.44.010 without first being registered with the Insurance Commissioner.

32.    RCW 48.44.180 states for the purposes of this chapter, the Insurance Commissioner shall have the same powers and duties of enforcement as are provided in RCW 48.02.080.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

6

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

33. RCW 48.15.020(1) states that an insurer that is not authorized by the Insurance Commissioner may not solicit or transact insurance business in this state.

34. RCW 48.15.023(5)(a)(i) states that if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.15.020(1), the Insurance Commissioner may issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

35. RCW 48.44.016(5)(a)(i) states if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.44.015(1), the Insurance Commissioner may Issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

36. RCW 48.02.080(3)(a) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may issue a cease and desist order.

37. The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.05.030(1) [Certificate of Authority required], RCW 48.15.020(1) [solicitation by insurer not authorized prohibited] and RCW 48.44.015(1) [registration by health care service contractor required].

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, RCW 48.15.023, RCW 48.44.016 and other applicable sections of the Insurance Code of the state of Washington.

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335

LA - 1602799 - 1

7

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this __22__ day of __April_____, 2020.


MIKE KREIDLER
Insurance Commissioner

By and through his designee


SOFIA PASAROW
Insurance Enforcement Specialist
Legal Affairs Division

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

Alliance for Shared Health, Inc.
7600 Bolongo Bay
St. Thomas, VI 00802

John Lewis
*Registered agent for Alliance for Shared Health, Inc.*
3155 Sutton Blvd, Ste 201
Saint Louis, MO 63143

*Courtesy copy to:*
Kyle Gilster
Attorney at Law
750 17th St NW, Ste 900
Washington, DC 20006
kyle.gilster@huschblackwell.com

Dated this 23rd day of April, 2020, in Tumwater, Washington.

KIMBERLY SHOBLOM
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335

9

LA - 1602799 - 1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

Exhibit J

## STATE OF WASHINGTON
## OFFICE OF THE INSURANCE COMMISSIONER

| | |
|---|---|
| *In the Matter of* | Order No.     20-0250 |
| **ONESHARE HEALTH, LLC,** | ORDER TO CEASE AND DESIST |
| Unauthorized Entity/ Respondent. | |

Pursuant to RCW 48.02.080 and RCW 48.15.023, the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A. Acting as an insurer in the state of Washington;

B. Engaging in or transacting the unauthorized business of insurance in the state of Washington;

C. Seeking, pursuing, and obtaining any insurance business in the state of Washington;

D. Soliciting Washington residents to purchase any insurance to be issued by an unauthorized insurer; and

E. Soliciting Washington residents to induce them to purchase any insurance contract.

**BASIS:**

1.     The parent of OneShare Health, LLC, Anabaptist Healthshare, Inc., incorporated on May 26, 2015 in Virginia; on August 31, 2018, it amended its name to Kingdom Healthshare International; and on March 12, 2019, it amended its name to OneShare International (hereinafter referred to as "the Organization"). On April 9, 2019, the Organization registered Anabaptist

ORDER TO CEASE AND DESIST
ORDER NO. 20-0250

1

LA - 1602460 - 1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

Healthshare as a d.b.a. The Organization represents itself as a health care sharing ministry ("HCSM"), exempt from insurance regulation. It does not have members in Washington State.

2.       On November 10, 2016, the Organization formed a wholly owned subsidiary, Unity Healthshare, LLC; on August 27, 2018, it amended its name to Kingdom Healthshare Ministries, LLC; and on March 11, 2019, it amended its name to OneShare Health, LLC ("OneShare"). OneShare is incorporated in Virginia and headquartered in Texas. OneShare represents itself as a HCSM, exempt from insurance regulation. It has members in Washington State and it does not hold a Certificate of Authority in this state.

3.       There is pending litigation in Fulton County Superior Court (Georgia) between OneShare and Aliera Healthcare, Inc. ("Aliera"), regarding Aliera's marketing of OneShare's insurance products. Aliera is also the subject of an enforcement action by the Insurance Commissioner.

4.       Following a referral from its producer licensing division, the Insurance Commissioner opened an inquiry to determine 1) if OneShare is a legitimate HCSM in compliance with state and federal law, and 2) if it is not a bona fide HCSM, whether it is acting as an unauthorized insurer in Washington State.

## *OneShare does not meet the legal definition of a health care sharing ministry.*

5.       To qualify as a health care sharing ministry under Internal Revenue Service (IRS) and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. In addition, the organization (or its predecessor) must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

6.       OneShare has not been in operation and continuously sharing amongst members since 1999. To meet this requirement, OneShare relies entirely on a letter, dated July 14, 2015, from the Department of Health & Human Services ("DHHS"), approving the Organization as a HCSM. However, there are several problems with OneShare's reliance on this letter: (1) the Organization serves a different religious community than OneShare serves, (2) the letter from DHHS contains a disclaimer that it is not binding on state authorities, (3) the Organization has not been in operation since 1999, and (4) the Organization is not OneShare's "predecessor."

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

7.      OneShare explained that the Organization and OneShare serve different communities. The Organization's membership focuses on members of the traditional Anabaptist church or those who work for Anabaptist ministries or employers. The Organization does not have and has never had any Washington members. On the other hand, OneShare members are not required to be practicing Anabaptists or among those who work for Anabaptist ministries. Instead, each member must attest to OneShare's Statement of Beliefs which is founded on Biblical principles. OneShare explained that creating OneShare allowed a larger community to take advantage of healthcare sharing services in accordance with their faith. This distinction in beliefs between the two sets of members runs contrary to the continuous sharing requirement for HCSMs.

8.      OneShare denies that it is a separate legal entity from the Organization and points out that, for tax purposes, it is not treated as a separate legal entity. In support, it provided an IRS Announcement which states that an LLC, if wholly-owned by an organization exempt under section 501(c)(3) of the Internal Revenue Code, may be disregarded as a separate entity for federal tax purposes. However, members were signed up with OneShare as their insurer, not the Organization. Further, and most importantly, the Insurance Commissioner is not bound by the IRS's tax treatment of OneShare.

9.      Additionally, in order to qualify as an HCSM, an entity must conduct an annual audit performed by an independent certified public accounting firm. OneShare failed to meet this requirement. OneShare provided the Insurance Commissioner with an audit of the Organization for year ending December 31, 2016. The audit report is dated September 20, 2019. On this basis alone, OneShare fails to qualify as an HCSM.

*OneShare is acting as an unauthorized insurer in the state of Washington.*

10.     Because OneShare is not qualified as a HCSM, it is acting as an unauthorized insurer. OneShare asserts throughout its website and written materials that it is not insurance, does not guarantee payment of medical expenses, and does not enter into contracts with members. However, based on those same materials, the members pay a monthly fee and, in return, OneShare pays providers for covered services upon the members getting sick or injured. This qualifies as insurance.

11.     At the time OneShare terminated its contract with Aliera on August 10, 2018, OneShare had approximately 2,900 Washington members. Since then, 1,470 Washington residents

have been OneShare members, with a current total of 1,091 Washington members. Members from Washington have paid OneShare a total of $1,239,328.15 to date.

12.    Based on their website, OneShare continues to offer Washington consumers insurance.

13.    RCW 48.01.040 states that "insurance" is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.

14.    RCW 48.01.050 states in relevant part that "insurer" as used in this code includes every person engaged in the business of making contracts of insurance.

15.    RCW 48.43.009 provides that health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes of this section, "health care sharing ministry" has the same meaning as in 26 U.S.C. Sec. 5000A.

16.    26 U.S.C. Sec. 5000A states the term "health care sharing ministry" means an organization—

> (I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),
> (II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,
> (III) members of which retain membership even after they develop a medical condition,
> (IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and
> (V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

17.    RCW 48.05.030(1) states no person shall act as an insurer and no insurer shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the Insurance Commissioner and then in force; except, as to such transactions as are expressly otherwise provided for in this code.

18.    RCW 48.15.020(1) states that an insurer that is not authorized by the Insurance Commissioner may not solicit or transact insurance business in this state.

19.    RCW 48.15.023(5)(a)(i) states that if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.15.020(1), the Insurance

Commissioner may issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

20.     RCW 48.02.080(3)(a) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may issue a cease and desist order.

21.     The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.05.030(1) [Certificate of Authority required] and RCW 48.15.020(1) [solicitation by insurer not authorized prohibited].

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, RCW 48.15.023, and other applicable sections of the Insurance Code of the state of Washington.

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this _31_ day of _March_ , 2020.

MIKE KREIDLER
Insurance Commissioner

By and through his designee

ELLEN RANGE
Insurance Enforcement Specialist
Legal Affairs Division

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to*:

Tyler Hochstetler
2452 S. Seminole Trail
Madison, VA 22727
*Registered Agent for OneShare Health, LLC*

*Courtesy copy to:*
Kyle G.A. Wallace
Attorney at Law
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Kyle.wallace@alston.com
*Attorney for OneShare Health, LLC*


Dated this 31st day of March_____, 2020, in Tumwater, Washington.


DAWN KRECH
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST       6       State of Washington
ORDER NO. 20-0250                      Office of Insurance Commissioner
                                          PO Box 40255
LA - 1602460 - 1                        Olympia, WA 98504-0255