The Honorable Barbara J. Rothstein

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
8                                    AT SEATTLE

9

10    GERALD JACKSON, ROSLYN JACKSON          NO. 2:19-cv-01281-BJR
      DEAN MELLOM, JON PERRIN and JULIE
11    PERRIN, individually and on behalf of all
      others similarly situated,
12                                             **PLAINTIFFS' MOTION TO STRIKE**
                              Plaintiffs,      **ALIERA'S ANSWER AND ENTER**
13                                             **DEFAULT JUDGMENT AFTER**
             v.                                **CLASS CERTIFICATION OR, IN THE**
14                                             **ALTERNATIVE, MOTION FOR**
      THE ALIERA COMPANIES, INC., a            **SUMMARY JUDGMENT**
15    Delaware corporation; ALIERA
      HEALTHCARE, INC., a Delaware
16    corporation; TRINITY HEALTHSHARE,
      INC., a Delaware corporation,
17
                              Defendants.
18

19                          **I.   INTRODUCTION[1]**

20          Defendant Aliera is presently unrepresented in this matter.  Ninth Circuit caselaw

21    is clear – if a corporate defendant is unrepresented by counsel, the Court may strike its

22    Answer and enter a default judgment, after class certification, in favor of the Plaintiff

23    Class.  The Court provided Aliera with sufficient time to obtain substitute counsel before

24    the withdrawal of its former counsel, Burr Forman.  *See* Dkt. No. 150, p. 2.  Aliera failed

25    _____

26          [1] Plaintiffs' counsel certifies that they met and conferred about this Motion and the Motion for Relief
      from Deadline or Telephonic Hearing with Aliera's counsel at Burr Forman before their withdrawal from
      this case.  *See* Hamburger Decl., ¶19.

      PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND                    SIRIANNI YOUTZ
      ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,              SPOONEMORE HAMBURGER PLLC
      IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 1                3101 WESTERN AVENUE, SUITE 350
      [Case No. 2:19-cv-01281-BJR]                                     SEATTLE, WASHINGTON  98121
                                                                  TEL. (206) 223-0303  FAX (206) 223-0246

to take action and is now unrepresented.  The Court should strike Aliera's Answer (Dkt. No. 63), certify the proposed class and enter a default judgment.

Should Aliera appear with new counsel, the Court should proceed to adjudicate this Motion for Summary Judgment on the merits:

Plaintiffs were sold "AlieraCare," an illegal health insurance plan created by Defendants The Aliera Companies, Inc., Aliera Healthcare, Inc. (collectively "Aliera") and Trinity Healthshare, Inc. ("Trinity").  In marketing, selling and administering these plans, Aliera represented to Plaintiffs that Trinity was a "recognized" health care sharing ministry ("HCSM") and therefore exempt from all federal and state laws governing health insurance.

This was simply false, and Aliera knew it: the federal and state statutes defining HCSMs provide that an entity can qualify as an HCSM *only* if it has "been in existence at all times since December 31, 1999" with medical expenses of its members having been "shared continuously and without interruption since at least December 31, 1999."  26 U.S.C. § 5000A(d)(2)(B)(ii); RCW 48.43.009.   Aliera insiders created Trinity on June 27, 2018, rendering it impossible to fall within the HCSM exemption.[2]  *See* Dkt. No. 62, ¶61; Dkt. No. 77, *Exh. B*, p. 13 (supplemental admission to RFA No. 10).  No governmental entity ever "recognized" that Trinity was an HCSM.

That Trinity never met the statutory exemption did not deter Aliera from promoting, selling, and administering the health plan to Plaintiffs as being part of a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. §5000A(d)(2)(B)."  *See* Perrin Decl., *Exhs. D, E.*  Aliera sold and administered the plans, while ignoring the array

---

[2] Nor did Trinity limit its participation to members who "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs" as independently required by state and federal law. 26 U.S.C. § 5000A(d)(2)(B)(ii); RCW 48.43.009.  *See* Dkt. No. 55, ¶4, Dkt. No. 40-4, p. 34 of 42 (Washington Office of the Insurance Commissioner ("OIC"): "Trinity's contradictory representations about the nature of its religious ethic to State and Federal government agencies and to consumers indicates it either does not understand its religious motivation, or fails to communicate a consistent message about its religious ethic to State and Federal regulators and its own members.").

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 2 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

of carefully crafted federal and state laws designed to protect Washington consumers in the health insurance marketplace.  The plans were sold without the necessary surplus, reserves, and reinsurance, designed to make sure that the AlieraCare products would have sufficient funds to pay out the benefits promised.  Aliera also ignored the baseline package of essential health benefits required under Washington law, the law's protections for people with pre-existing conditions, and the required loss ratio that ensures that health insurers spend the vast majority of premiums collected on members' health benefits, among other requirements.

Aliera's sham HCSM plan funneled hundreds of millions of dollars in monthly premiums into Aliera's coffers, a for-profit and privately held enterprise owned by the Moses family.  Consumers paid hundreds – or thousands – of dollars per month for AlieraCare.  Under Aliera's original agreement with Trinity, over 80% of the premiums paid by these members are actually sent to the privately held, for-profit Aliera as "administrative fees" or paid out in brokers' commissions, with less than 20% of member premiums being used to pay members' health claims.[3] Dkt. No. 57-3, p. 22 of 42.  *See also* Luria Decl., ¶11 (in 2021, only about 30% of the monthly payments from consumers went to pay for medical expenses).  Aliera's scheme could never cover the medical expenses it promised it would.

This fraud was perfectly designed to dupe vulnerable people: Aliera created products that look exactly like traditional health insurance and sold them under the guise of religion, falsely claiming that Trinity was a "ministry" designed to assist members in their time of medical need. By ignoring the requirements of state and federal law governing health insurance, and, in fact, disclaiming any legal responsibility to pay *any*

---

[3]  Washington law requires that at least 74% of premiums be used to pay claims.  RCW 48.20.025; RCW 48.44.017; RCW 48.46.062.  The ACA raised this floor to require an 80% medical loss ratio for individual policies.  42 U.S.C. § 300gg-18(b)(1)(A)(ii).  Defendants turned this requirement on its head.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 3
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

claims, Aliera turned the sham HCSM into a money machine that lined Aliera's – and its founders' – pockets with tens if not hundreds of millions.

Like all Ponzi schemes, this one has collapsed. On July 8, 2021, Trinity (now called Sharity Ministries, Inc.) entered bankruptcy and under its current plan it will be liquidated. Luria Decl. ¶5. There is no money left in Trinity to pay any unpaid medical bills. *See* Hamburger Decl., *Exh. 17*, p. 81 of 86. [4] On October 11, 2021, Aliera recorded a Deed of Assignment for Benefit of Creditors ("Aliera ABC") in Georgia to wind down its business. *Id., Exh. 1*.[5] Aliera's counsel, Burr Forman, have withdrawn from this litigation, and no replacement counsel has appeared. *See* Dkt. No. 150. Ultimately, the remedies for consumers like the Plaintiffs now lie in the bankruptcy court and the Aliera ABC process.

Plaintiffs seek an immediate adjudication of their claims and class certification so that the Washington class may be considered creditors in the Aliera ABC process. Accordingly, they move to expedite their motion and request a telephonic hearing, and seek an immediate summary judgment for both rescission and reformation damages, Consumer Protection Act ("CPA") treble damages, attorney fees and litigation costs, so that they may protect their interests and that of other Washington state Trinity/Sharity members in the Aliera ABC and pursue those ultimately responsible for this fraud.

## II.   UNDISPUTED FACTS

### A.   Aliera Was Created By the Family of a Convicted Felon and Entered Into a Relationship to Sell Healthcare Plans it Marketed as HCSM Plans

Timothy Moses was convicted of felony securities fraud and perjury in federal court in Georgia. *See United States v. Moses*, 219 Fed. App's 847 (11th Cir. 2017) (affirming

---

[4] All exhibits identified by number in this Memorandum are attached to the Declaration of Eleanor Hamburger; and exhibits identified by letter are attached to the Declaration of Jon Perrin.

[5] The ABC Deed reveals that virtually no funds remain in Aliera, but that over $6.6 million in "Shareholder loans" were provided by Aliera. Hamburger Decl., *Exh. 1*, p. 15 of 25.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 4
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

his conviction). He was sentenced to over six years in prison. *Exh. 3,* at 8-9, ¶49.  After he was released, he was subject to supervision for five years.  *Exh. 5.*  Shortly after his release, Mr. Moses misled his supervising probation officer about his financial affairs and failed to disclose bank account information and new lines of credit.  *Id.* Mr. Moses' supervised release was terminated in April 2015, approximately six months before Aliera's creation. *Id.*

Mr. Moses's wife, Shelley Steele, incorporated Defendant Aliera on December 18, 2015 in Delaware.  It is a for-profit corporation with headquarters in Atlanta, Georgia. *Exh. 6.* Aliera's original scope of business was "to engage in the business of providing all models of Health Care to the general public," and "[t]o buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders…." *Id.*  It later amended its Articles to include a broader scope of business: "The purpose for which the Corporation is formed is to engage in any lawful act or activity for which corporations may be organized…" *Exh. 7.* Aliera has never been and does not claim to be an HCSM.

After Aliera's formation, Timothy Moses convinced Anabaptist Healthshare, a small nonprofit with a letter of recognition as an HCSM from the federal government, to allow Aliera to market HCSM plans through a subsidiary that Anabaptist would create solely for that purpose, Unity Healthshare.  *Exh. 3,* at 4-5, ¶¶18-24. Mr. Moses admitted in sworn testimony that he played a substantial role in the relationship between Anabaptist and Aliera.  *Exh. 4,* ¶¶20-27, and its attached Exhibits A and B (signing as "Executive Director" of Aliera).

The relationship between Aliera and Anabaptist soured by May 2018 when Anabaptist discovered that Mr. Moses had misappropriated Unity funds. *Exh. 3,* at 13, ¶71. Anabaptist terminated its agreement with Aliera on August 10, 2018, and the parties sued each other in state court in Georgia, *Aliera Healthcare v. Anabaptist Health Share, et al.,*

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 5
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

No. 2018-cv-308981 ("Georgia Litigation").   *See generally, Aliera Healthcare, Inc. v. Anabaptist Healthshare,* 844 S.E. 2d 268 (Ga. App. 2020).

### B. Aliera Creates Trinity As a Sham HCSM That It Controlled In Order to Continue Selling Healthcare Plans

With the prospect of Aliera's relationship with Anabaptist coming to an end, Aliera created Trinity Healthshare, Inc. as a Delaware nonprofit entity on June 27, 2018. *Exh. 11,* at 5.  Aliera installed William Thead, a former employee and close personal friend of the Moses family, as Trinity's CEO.  Dkt. No. 63 (Aliera's Answer), p. 19 of 39, ¶¶62, 63. Trinity initially had only one other board member – Mr. Thead's brother.  *Exh. 12,* at 7 and 33 of 43. Trinity had no members when it was formed. Dkt. No. 63, at 19, ¶65.  On or about July 3, 2018, Aliera's attorney at Burr Forman filed an application with the IRS on behalf of Trinity seeking recognition as a 501(c)(3) tax exempt entity. Dkt. No. 22-1, p. 2 of 77.  Trinity represented to the IRS that it was applying for 501(c)(3) status as "a newly formed entity," and answered "no" to the question, "are you a successor to another organization?" *Id.*, p. 19 of 77 (answer to Part VII, question 1).

In August 2018, Aliera and Trinity entered into a Management and Administration Agreement.  *Exh. 2.* That Agreement was not the result of an arms-length transaction — it was signed on behalf of Trinity by Mr. Thead, the Moses family's hand-picked person to lead Trinity.  *Id.*, at 11.  Under that Agreement, Trinity delegated to Aliera the exclusive right to design, market, enroll, administer (either directly or through a third-party administrator), and prepare financial and tax statements for the joint Aliera/Trinity healthcare plans. *Id.*, at 4-5.  Under that Agreement, Aliera was to have exclusive control over the member list, and ***all member payments were to be made directly to a bank account in Aliera's name.*** *Id.,* at 4, ¶2.e., and at 5, ¶3.c.  Aliera would retain 65% of the total member payments for the type of plans the Perrins purchased.  Of the 35% that would be allotted to Trinity, only 44.3% of that amount (just 15.5% of the amount

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 6 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

members paid) would be placed in a reserve account, or "Sharebox" for payment of members' claims. *Id.*, *Exh. B*. Trinity reported to the IRS that in 2019 it paid Aliera $32,138,105 for "a variety of management services." *Exh. 13*, at 31 of 41.

In 2019, Aliera restructured and became The Aliera Companies, Inc.  It created four subsidiaries – Adevevo LLC, Ensurian Agency LLC, Tactic Edge Solutions, LLC, and USA Benefits & Administrators LLC - each of which entered into separate contracts with Trinity that replaced the August 2018 Management Agreement.  *See* Hamburger Decl., ¶13.  These new agreements became effective on January 1, 2020.  *Id.*  Under these agreements, Aliera's subsidiaries continued to control the sale of the Trinity plans, administration of claims, and all communications with members.  *Id.*

**C.    Washington's Insurance Commissioner Ordered Aliera to Cease Selling Trinity Plans In Washington, and Concluded With Finality that the Healthcare Plans Were Illegal Insurance Under Washington Law**

Aliera began selling the Trinity plans in Washington in late 2018.  Approximately 3,058 Washington residents purchased Aliera's Trinity plans. Dkt. No. 77, p. 15-16 of 98, pp. 63-64 of 98 (Responses to Requests for Admission); *but see* Luria Decl., ¶8 (2,832 Washington residents were enrolled in Aliera/Trinity plans). After Washington's Office of the Insurance Commissioner received dozens of complaints about Aliera and Trinity, it concluded that Trinity was not a legitimate HCSM and was acting as an unauthorized insurer in violation of RCW 48.05.030. *Exh.* 8, at 37 of 41. As a result, the OIC issued Cease and Desist Orders on May 13, 2019 to both Aliera and Trinity, prohibiting them from soliciting or selling the healthcare plans to Washington residents. *Exhs. 14, 15.*

On December 20, 2019, Trinity settled its dispute with the OIC by agreeing it would not sell its plans to Washington residents and agreeing to pay a $150,000 fine. Dkt. No. 57-19.  It did not contest the OIC's findings and conclusions.  Aliera, however, contested the OIC's findings.  On November 13, 2020, after substantial discovery and briefing on cross motions for summary judgment, the administrative law judge

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 7
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

concluded that the Trinity products it sold qualified as "insurance" under the Washington definition in RCW 48.01.040, and that Trinity did not meet the criteria for an exemption from insurance regulation as an HCSM under RCW 48.43.009 and 26 U.S.C. § 5000A(d)(2)(B)(ii).[6] *Exh. 9.*

## D.   Plaintiffs Purchased AlieraCare and Did Not Receive the Promised Benefits

All Plaintiffs purchased an AlieraCare plan during the class period.  Dkt. No. 72-76. The AlieraCare plans were advertised as comparable to catastrophic health insurance that "allow[s] members to achieve comparable cost assurances for catastrophic healthcare services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine at a much lower cost …" *Exh. 10,* at 22 of 31.  The representations made by Aliera to Plaintiff Jon Perrin are typical of those made to all Washington AlieraCare enrollees.

Before Mr. Perrin purchased the plan, an Aliera Senior Sales Representative sent Mr. Perrin a "Sell Sheet" that laid out the coverage and prices of various healthcare plans. The "Sell Sheet" showed that the Premium plan was designed to "include" costs for hospitalization, in-patient surgery, out-patient surgery, and emergency room; to cover wellness and preventive care and telemedicine at 100%, and to cover x-rays, primary care, specialty care, and urgent care with consult fees or copays.  Declaration of Jon Perrin, *Exh. C.*  The sales representative described the plan as "an affordable alternative to the ACA" that was "not subject to an enrollment period." Perrin Decl., *Exh. A.* Mr. Perrin signed an enrollment form agreeing that Aliera could immediately bill his credit card for the first monthly fee ($203.67 for the Trinity portion, plus $378.24 for the Aliera portion

---

[6] After appealing this decision to Thurston County Superior Court, Aliera and the OIC reached a settlement which left the Final Order of the ALJ in place and required Aliera to pay a fine of $100,000. *Exh. 18.* To date, Aliera has not paid the OIC's fine.  *See Exh. 1,* p. 10 of 25.  The ALJ Order is now final after a fully litigated adjudication.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

of the plan), and the one-time application fees of $125, and agreeing that Aliera could collect the monthly amount as a "recurring monthly transaction." *Id.,* *¶4, Exh. D.* The enrollment form stated:

> "Hospitalization, Emergency Room, In-Patient, and Out-Patient procedures are covered, once the [MSRA] has been met. The Per Incident limit is $500,000 sharing amount, capped at $1,000,000 lifetime sharing amount."

*Id.,* at 1.   The form affirmatively misrepresented to the Perrins that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services." *Id.,* at 6 of 7.   The form did not reveal that Trinity and Aliera had agreed to place only 15.5% into an account for payment of claims, or that they in fact were deducting approximately 70% of member payments for payment to Aliera entities and to Trinity for "administrative" costs. *See* Luria Decl., ¶11.

After signing the enrollment form, Mr. Perrin received a membership card and the Member Guide for a healthcare plan for himself and his wife Julie.   Perrin Decl., *Exhs. E, F. See also* Dkt. Nos. 72-77.   The Member Guide incorporated the same table as included in the Sell Sheet.   Compare, *Exh. C* and *Exh. F,* p. 41.[7]   The Guide instructed that the members should present their membership card to their health care providers when they receive medical services. *Exh. F,* at 8 ("Keep your Member Card with you at all times; …"), and at 14  ("Upon arrival at a clinic, present your Membership Card and one photo ID.") The providers were to send a bill directly to Aliera, which then determined whether and how much will be paid.  *Exh. 10,* at 16 of 31. ("How does my doctor or hospital get paid? Once your medical provider has properly processed your medical

---

[7] Citations to the Perrins' Member Guide are to the page numbers printed on the bottom of each page of the Guide.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 9 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

claim to be shared by the membership, the medical need is adjudicated and payment is issued directly to the provider.")

The Perrins' membership was active from January 1 – December 31, 2019. Perrin Decl. ¶8. The Perrins had several medical claims that were submitted to Aliera, but Aliera did not pay them. Jon Perrin had several phone calls with Aliera representatives who told him that Aliera would pay a medical provider $1,531 for $9,074 billed for Julie's surgery. *Id.*, ¶6. Nevertheless, Aliera never made the payment, and the Perrins paid the $1,531 that Aliera represented it would pay in order to keep the bill from going to collections. *Id.* By early 2020, the Perrins realized that AlieraCare was a scam, and demanded the money they had paid in premiums to be returned to them. *Id.*, ¶7. Aliera refused. *Id.*, *Exh. J.* In total, the Perrins paid $6,982.92 in premiums plus $125 in one-time application fees. Luria Decl, ¶7; Perrin Decl., ¶8. As noted above, the other named plaintiffs had similar experiences. *See* Dkt. Nos. 72-77, 117.

The Perrins were added as Plaintiffs in this case on June 10, 2020. Dkt. Nos. 56, 57. This Court ordered their claim to arbitration on August 18, 2020. Dkt. No. 105. The Court later ordered arbitration of the remaining Plaintiffs' claims on October 6, 2020. Dkt. No. 131. Plaintiffs moved together for the arbitrator to determine whether he had jurisdiction to hear the dispute. *See* Dkt. No. 144-1. On September 2, 2021, the arbitrator held that he lacked jurisdiction to hear Plaintiffs' claims, and returned the matter to this Court. *Id.*

**E.    Trinity Is Bankrupt and Aliera Is Going Out of Business, Raising Fears that Aliera's Principals May Be Hiding Assets**

Trinity changed its name to Sharity Ministries, Inc. in 2020, and filed for bankruptcy as "Sharity" on July 8, 2021. *In re Sharity Ministries, Inc.,* Case No. 21-11001 (JTD). Luria Decl., ¶4. At the time of the bankruptcy filing, 60% of member payments went to Aliera, and 10% went to Trinity for administrative expenses, leaving only 30% of

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 10 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

the members' payments to be placed into a "Sharebox" account for payment of members' medical claims. Luria Decl., ¶11. Trinity had assets of less than $4 million (apart from $23.6 million owed to it by Aliera), while unpaid member claims totaled over $300 million. Hamburger Decl., *Exh. 17,* pp. 14, 81 of 86. Although filed under Chapter 11 of the Bankruptcy Code, Trinity will not emerge from bankruptcy. It filed a Plan for liquidation on October 1, 2021 and will go out of business. *Id.,* p. 10 of 86; Luria Decl., ¶5.

Aliera recorded a deed of assignment for the benefit of creditors on October 11, 2021, and is also going out of business. Hamburger Decl., *Exh. 1.* The assignment reflects virtually no assets and substantial debts. *Id.* It also shows a "loan" of more than $6.6 million by Aliera to its "shareholders." *Id.,* p. 15. Plaintiffs' counsel believe Aliera's insiders may hold significant unaccounted-for amounts that members paid for coverage of their healthcare costs. Through its attempts to enforce a meritless arbitration clause, Aliera succeeded in delaying resolution of this litigation for well over a year, giving its insiders time to squirrel away misappropriated assets. Plaintiffs require an immediate judgment if they are to have any chance of obtaining a recovery on their claims. Time is of the essence, and judgment should be entered as soon as possible.

**F.   No Counsel Presently Represents Aliera in this Matter**

The Court held a telephonic hearing on October 6, 2021 on Plaintiffs' pending Motion to lift the stay (Dkt. No. 143) and Burr Forman's motion to withdraw as counsel for Aliera (Dkt. No. 146). As a result of the hearing, the Court both lifted the stay and allowed Aliera fifteen (15) days to retain substitute counsel. At the expiration of 15 day, the Court released Burr Forman from any ongoing representation of Aliera in this matter. Dkt. No. 150. Burr Forman officially withdrew on October 21, 2021. No substitute counsel has made an appearance on behalf of Aliera. Accordingly, Aliera is unrepresented in this matter.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 11
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

In order to reach an immediate judgment as to Aliera, Plaintiffs move for summary judgment and class certification.  If Aliera retains counsel, and responds to this motion, the Court may issue a substantive ruling on both summary judgment and class certification.  If Aliera remains unrepresented, the Court should certify the proposed class consistent with Rule 23 requirements, strike Aliera's Answer and enter a default judgment in favor of the certified class.  Plaintiffs request an expedited telephonic hearing in order to reach a judgment without further delay.

## III.  ARGUMENT

### A.  Aliera's Answer May be Stricken and Default Judgment Entered If Aliera is Unrepresented.

"When a corporation fails to retain counsel to represent it in an action, its answer may be stricken and a default judgment entered against it." *Rojas v. Hawgs Seafood Bar, Inc.*, No. C08-03819 JF (PVT), 2009 U.S. Dist. LEXIS 41435, 2009 WL 1255538, at *1 (N.D. Cal. May 5, 2009).  Where, as here, a corporate defendant is unrepresented, a permissible sanction is default.  *Emp. Painters' Tr. v. Ethan Enters.*, 480 F.3d 993, 998 (9th Cir. 2007).  Before the default may be entered, the Court must first strike the corporate defendant's answer.  *Garis v. Gypsum Res. Materials, LLC*, No. 2:16-cv-02534-APG-VCF, 2017 U.S. Dist. LEXIS 214236, at *2-3 (D. Nev. Nov. 20, 2017); *Pac. Elements, LLC v. Interface Protein Tech., Inc.*, No. 1:16-cv-01247-LJO-EPG, 2017 U.S. Dist. LEXIS 8388, at *4-5 (E.D. Cal. Jan. 18, 2017) (Magistrate recommended that the defendant's answer be stricken and default entered since the corporation was unrepresented); *SEC v. Neman*, No. CV 12-03142-BRO (PLAx), 2016 U.S. Dist. LEXIS 185326, at *3-4 (C.D. Cal. Apr. 26, 2016) (striking a corporation's answer for failure to retain new counsel after prior counsel withdrew and Court advised defendant corporation to obtain new counsel).  If Aliera does not appear

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 12
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

through counsel for the telephonic hearing requested by Plaintiffs, the Court should strike its Answer and enter a default judgment after class certification.

Should counsel for Aliera appear, the Court should consider the following Motion for summary judgment on the merits.

## B.  Aliera Sold Illegal Insurance Contracts to Plaintiffs.

### 1.  The Healthcare Plans Are Insurance

Washington defines "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." RCW 48.01.040. The healthcare plan sold to the Perrins promise explicitly and implicitly to pay specified amounts in the event members incur defined medical expenses, and have the attributes of health insurance policies. That plan meets the definition of "insurance" under Washington law.

In return for payment of their member contributions, the Member Guide unambiguously outlined a plan that will pay for determinable healthcare services:

- "the plans *cover* medical services recommended by the USPSTF and outlined in the ACA for preventive care." *Exh. F*, at 4 (emphasis added).

- "Telemedicine consultations *are free* for you and dependents on your plan." *Id.,* at 9 (emphasis added).

- "Members have no out-of-pocket expenses for preventive services., which include, but are not limited to, routine in-network checkups, pap smears, flu shots and more." *Id.,* at 11.

- "Aliera and Trinity Members have access to lab work in the convenience of their in-network provider's office or at any lab location nationwide." *Id.,* at 11.

- The plan has a fixed number of covered Urgent Care and Primary Care visits per year, with co-pays. *Id.***,** at 41.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 13 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

- "X-rays are included, and subject to a $25 per read fee at Urgent Care." *Id.*, at 12.

- For hospitalization, "[o]nce the MSRA [deductible] has been reached in full, the sharing *will then be reimbursed* directly back to the providers and hospital facilities." *Id.*, at 15 (emphasis added). *See also, Exh. D*, at 1 (enrollment form: "Hospitalization, Emergency Room, In-Patient, and Out-Patient procedures *are covered*, once the Member Shared Responsibility Amount has been met.") (emphasis added)

The Member Guides provide that:

Medical costs *are shared on a per person per incident basis for illnesses or injuries incurring medical expenses* after the membership effective date when medically necessary and provided by or under the direction of licensed physicians, osteopaths, urgent care facilities, clinics, emergency rooms, or hospitals (inpatient and outpatient), or other approved providers.

*Exh. F,* at 23 (emphasis added).

Aliera represented that it would pay benefits according to the terms of the plan. *Id.*, at 3 ("Medical needs are only shared by the members according to the membership guidelines.") The Member Guide informs the members that all control of the payment of benefits rests exclusively with Trinity, who is given the "final authority" over payment decisions. *Id.*, at 22. In reality, all control was delegated to Aliera under the Management and Administration Agreement. Hamburger Decl., *Exh. 2.* Aliera's health plans include features that "involve[] both risk-shifting and risk-distributing," the hallmarks of insurance under Washington law. *In re Estate of Smiley,* 35 Wn.2d 863, 867, 216 P.2d 212 (1950).

Plan features render the plans indistinguishable from genuine health insurance:

- Aliera's plans are marketed as providing payment benefits for specified health-related contingencies in exchange for a monthly payment, and the benefit amounts are tied to the amount of the monthly premium and cost incurred. Perrin Decl., *Exhs. B, C.* The "standard" Premium plan sold to the Perrins is represented as including "physician visits, pharmaceuticals, basic eye and hearing exams, both in and outpatient procedures, extended hospitalizations,

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 14 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

urgent care needs, labs, and diagnostic procedures.   It's an all-inclusive, affordable healthcare option."  Hamburger Decl., *Exh. 10*, at 21 of 31.

- The healthcare plans charge "members" a "monthly contribution" specifically referred to as "premiums." *Exh. 10*, at 4 of 31 ("Every month, members send their contributions (premiums) to Trinity …" *See Exh. F*, at 18 (describing the requirements for "financial participation"). The premium was required for the member to receive health coverage.  *Exh F*, at 43 ("This membership is issued in consideration of the Member's application and the Member's payment of a monthly fee as provided under these Plans."); *Exh. D* (Perrins' Enrollment form states the amount of the monthly "Premium").

- The plans require a member to pay a "Member Shared Responsibility Amount" ("MSRA"), *Exh. F*, at 21, that is "similar to a deductible." *Exh. 10*, at 4 of 31.

- The amount of contribution (or premium) a member pays is dependent on the amount of the MSRA (or deductible) and the amount of benefits the Plan pays, the age of the member, the number of dependents covered, and whether the member smokes. *Exhs. B, C.* In other words, the more risk to Aliera/Trinity of paying substantial claims, the higher the premium payment for the member.

- After the MSRA is paid, and if a member is current in paying the monthly "contribution," medical bills are "eligible for sharing" in accordance with a benefits booklet or member guide for the selected program.  *See e.g.*, *Exh. F*, at 15, 36-41.

- The plans require pre-authorization of certain non-emergency surgeries, procedures, or tests, as well as for certain types of cancer treatments.   *Exh. F*, at 32 ("The member must have the following procedures or services pre-authorized as medically necessary prior to receiving the service.")

- The plans purport to provide coverage for medical expenses, including for primary care visits, specialty care visits, hospitalization, emergency room, prescription drugs, labs, preventive care, urgent care, hospice, maternity, and x-rays.  *Exh. F*, at 36-41.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 15 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

- Claims for payments are submitted by providers on standard insurance billing forms, HCFA1500 or UB 92. *Exh. F*, at 26. Aliera then determines whether and how much will be paid.

- The plans purport to use a Preferred Provider network with greater benefits provided when a member uses an in-network provider. *Exh. F*, at 15, 36-41.

- Aliera provided an Explanation of Benefits ("EOB") to the members that looks just like EOBs from health insurers. *See Exh. G.* Under the heading, "Important Information About Your Appeals Rights," the EOBs warn about ***insurance*** fraud and instruct the members to contact the Washington Insurance Commissioner's office if they suspect fraudulent billing. *Id*.

- Payments for covered eligible medical expenses were made by Aliera directly to providers. *Exh. F*, at 15 ("Once the MSRA [deductible] has been reached in full, the sharing will then be reimbursed directly back to the providers and hospital facilities"); *Exh. 10*, at 5 of 31 ("Your doctor sends bills electronically to Trinity … Trinity pays the shareable amount of medical bills to your healthcare providers, but it will not pay inflated rates.") Members did not send payments to each other; rather, Aliera/Trinity paid medical providers directly, just like health insurers.

The plan is an agreement to pay or indemnify based upon "determinable contingencies." RCW 48.01.040. As a matter of law, the Aliera healthcare plan sold to the Perrins is "insurance."

After a lengthy investigation, the OIC determined that Aliera's healthcare plans are "insurance" as defined by RCW 48.01.040. The OIC's determination is entitled to great weight. *Marquis v. City of Spokane*, 130 Wn.2d 97, 111 (1996) ("a court must give great weight to the statute's interpretation by the agency which is charged with its administration …")

The OIC's determination was upheld by an Administrative Law Judge after discovery and an extensive full briefing. *Exh. 9.* The ALJ carefully reviewed the enrollment forms, the fee collected, and the Member Guides, and concluded that they

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 16 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

form a contract of insurance.  *Id.*, at 17, ¶25. In so concluding, she found that the plans operate similarly to insurance.  In particular, the ALJ noted that the plans offer in-network providers that are cheaper for members than out-of-network providers, include lists of exclusions or services not "eligible," and MSRAs that operate as deductibles. *Id.*, at 16, ¶21.  The ALJ pointed out graphics used by Aliera/Trinity, identical to those found in insurance plans, that include "network" and "non-network" amounts, with percentages and dollar amounts for what is "eligible to be shared." *Id.*, ¶22.  *See Exhs. C and F,* at 36-41.

The ALJ concluded that offering certain services that are "covered" at "zero expense" to the member, is an explicit promise to pay a specified amount upon a determinable contingency.  *Exh. 9*, at 16, ¶21.  She also concluded that there were implicit promises to pay. The fact that the plans laid out in graphic form the specific percentages members will be responsible for, with the remainder "eligible for sharing" made it appear "as if it is what is guaranteed by making a monthly contribution." *Id.*, at 16-17, ¶22.  The plans were offered as providing something – e.g., low-cost alternatives to traditional insurance, or "comprehensive coverage" – in return for purchasing a product, rather than making a charitable donation, which promises nothing in return. *Id.*, at 17, ¶23. Finally, the fact that Aliera/Trinity engage in some risk calculation also contributed to the ALJ's conclusion that the plans were insurance. *Id.*, at 17, ¶24. As noted above, this decision is now final and has res judicata effect.  *See In re Marriage of Shortway*, 4 Wn. App. 2d 409, 422, 423 P.3d 270, 277 (2018).

Washington's OIC is not the only regulator to reach this conclusion.  Insurance regulators in at least twelve other states have also found that the Aliera plans qualify as "insurance."[8]  So have multiple federal courts.

_____

[8] Those states include California, Colorado, Connecticut, Iowa, Maryland, Michigan, New York, New Hampshire, New Jersey, New Mexico, Oregon, and Texas.  Orders from those states are collected at http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

On June 22, 2021, a federal court in Georgia considered these Aliera plans and concluded they were insurance. *LeCann v. Aliera Cos.*, No. 1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827 (N.D. Ga. June 22, 2021). *Exhibit 16* is a copy of the Order. Like Washington's RCW 48.01.040, the Georgia statue at issue there defines insurance as a contract "which is an integral part of a plan for distributing individual losses whereby ***one undertakes to indemnify another or to pay a specific amount or benefits upon determinable contingencies***." O.C.G.A. § 33-1-2(4) (emphasis added). The *LeCann* court carefully considered the same Member Guides at issue here and found they "clearly outline a plan to indemnify members or pay certain amounts upon determinable contingencies and distribute losses among members." *Id.*, at 48. It found that coverage was conditioned on timely payment and that Aliera "distributes losses among members." *Id.*, at 50. Citing to much of the language from the Member Guides cited above, the court held "[a]ll of this language shows that Aliera has undertaken to pay certain amounts — whether full coverage, 60% after the deductible is met, or the like — upon certain contingencies, *i.e.*, sickness, illness, maternity, *etc*." *Id.*, at \*54. *See also Moeller v. Aliera Cos.*, No. CV 20-22-H-SEH, 2021 U.S. Dist. LEXIS 122532, at \*8-9 (D. Mont. June 30, 2021) ("The 2019 Trinity Member Guide was, notwithstanding disclaimer by Defendants Aliera and Trinity, an insurance contract (plan) under Montana law").

A functionally identical health care sharing programs was also found to be "insurance" in Kentucky.[9] *Commonwealth v. Reinhold*, 325 S.W.3d 272, 273 (Ky. 2010). In that case, the court rejected the sharing entity's claim that it did not shift the risk of incurring medical charges from its members to itself:

> [T]he Medi-Share program fits comfortably within the statutory definition of an insurance contract.

---

[9] *See also, Rowden v. Am. Evangelical Assoc.*, 2007 Mont. Dist. LEXIS 7, \*11 (Mont. Dist. Ct., Jan. 2, 2007) (holding health sharing plans to be "insurance").

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

* * *

The "commitment" contract, as previously quoted, obligates Medi-Share members to pay their monthly "share" by the first of each month because their "fellow believers in Christ" *rely* upon that payment to satisfy their medical needs. In return for paying their monthly "share," Medi-Share members remain eligible to receive payment for their medical needs through the program. ***This process clearly shifts the risk of payment for medical expenses from the individual member to the pool of sub-accounts from which his expenses will be paid. Thus, regardless of how Medi-Share defines itself or what disclaimers it includes in its literature, in the final analysis, there is a shifting of risk.***

*Reinhold,* 325 S.W.3d at 276-77 (emphasis in the original and added).

### 2.    The AlieraCare Plans Are Not Exempt from Insurance Regulation

Aliera claims that the Trinity plans it created are exempt from state insurance regulation under RCW 48.43.009. because Trinity qualified as a "health care sharing ministry." That statute provides:

Health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050.  For purposes of this section "health care sharing ministry" has the same meaning as in 26 U.S.C. Sec. 5000A.

The definition of an HCSM in the incorporated federal statute requires, *inter alia,* that (1) the entity, or its predecessor, to have been "in existence at all times since December 31, 1999," and  sharing expenses "continuously and without interruption since at least December 31, 1999;" and (2) that it conduct an annual audit by "an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request."  26 U.S.C. § 5000A(d)(2)(B)(ii).

It is undisputed that Trinity, which Aliera represented as an HCSM, was not created until June 27, 2018.  Dkt. No. 62, p. 18, ¶61.  Trinity's application for 501(c)(3) tax exempt status with the IRS (which Aliera's attorneys submitted) represented that Trinity had no predecessors.  Dkt. No. 22-1, p. 2 and 19 (Part VII.1) of 77.  Moreover, it had no

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 19 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

members when it was created and could not have been "continuously and without interruption" sharing medical expenses since December 31, 1999. Dkt. No. 62, p. 19, ¶65. It does not meet a necessary requirement under the federal statute and cannot qualify as a legitimate HCSM under RCW 48.42.009. *See also, Exh. 16* (*LeCann* Order*)*, at 67 (finding Trinity did not qualify as an HCSM under the federal statute because it had not been in existence at all times since December 31, 1999).

Nor can Trinity meet the fifth requirement under the federal statute. It has not conducted an annual financial audit, or made those audits available to the public. Luria Decl., ¶12.[10] *See also, Exh. 9*, at 22, ¶42 (ALJ Decision finding that Trinity has conducted no audits as required by this section).

### 3. The Aliera Insurance Plans Were Never Authorized by the Washington Insurance Commissioner and Are Illegal

It is undisputed that neither Aliera nor Trinity was authorized to provide insurance in Washington State. Dkt. No. 63, at 4, ¶9, at 14, ¶42 (Aliera's answer). It is also undisputed that the plans Aliera and Trinity sold were never reviewed or approved by the OIC. RCW 48.18.100 requires that all insurance policy forms be filed with and approved by the OIC *before* they are issued, delivered or used. That requirement ensures that all health insurance sold in Washington complies with minimum reserve and solvency requirements, mandatory benefits and standard consumer disclosures. The sale of any unfiled and unauthorized health plan in Washington is illegal. RCW 48.18.100.[11]

---

[10] Although Trinity retained a third-party firm to conduct an audit for 2018 (the first six months of its existence), that firm later withdrew the audit. No audit has since been conducted. Luria Decl., ¶9.

[11] This is not the only Washington insurance law that Aliera violated. *See Exh. 9*. However, given the expedited nature of this Motion, Plaintiffs do not detail each and every Washington insurance law violated.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

4.      **Plaintiffs and the Class Are Entitled to Rescind the Healthcare Plan They Purchased**

Aliera designed, marketed and sold illegal and unauthorized health insurance to Washington residents like the Perrins, in violation of Washington law.  A contract that is contrary to the terms and policy of a statute is illegal and unenforceable.  *Vedder v. Spellman,* 78 Wn.2d 834, 837, 480 P.2d 207, 209 (1971).  Where enforcement of a contract is contrary to public policy, the contract may be null and void.  *Scott v. Cingular Wireless,* 160 Wn.2d 843, 851, 161 P.3d 1000 (2007); *Kennedy v. Rode,* 41 Wn. App. 177, 181, 702 P.2d 1240 (1985).

The remedy for the sale of an illegal insurance plan is either recission or reformation, at the option of the insured.  For example, in *Crnkovich v. Columbus Life Ins.,* 118 P.3d 153 (Id. 2001), an insurance beneficiary sued his insurance company for rescission of the policy because the insurer did not possess the certificate of authority from the state insurance commissioner to issue the policy.  Idaho's highest court found that the policy may be "void and unenforceable" when the seller has not obtained the appropriate qualifications to conduct business in the state.  *Id.* at 156.  "[A]n insurance contract sold in Idaho by a company that is not authorized to conduct insurance business in this state is ***either enforceable or voidable*** at the option of the insured or beneficiary."  *Id.* (emphasis added).

Similarly, in *Mega Life & Health Ins. Co. v. Jacola,* 954 S.W.2d 898, 902 (Ark. 1997), the Arkansas Supreme Court ruled in favor of a class action to resolve a dispute over a similarly deceptive and unauthorized health plan.  *See id.* at 899.  Finding commonality satisfied for class certification purposes, the Court held:

> If these issues are resolved in favor of the class, the individual members will have suffered a common injury of paying premiums for a void insurance policy. Thus, ***the class members may be entitled to rescission of the policies and a refund of the premiums paid, or coverage for outpatient services.***

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 21 [Case No. 2:19-cv-01281-BJR]

Sirianni Youtz
Spoonemore Hamburger PLLC
3101 Western Avenue, Suite 350
Seattle, Washington  98121
Tel. (206) 223-0303  Fax (206) 223-0246

*Id.* at 902.  Allowing class members to choose the appropriate remedy makes sense since some will benefit most by a return of the monthly premiums, while others may benefit more from payment of their uncovered medical expenses.

### a. Recission

"Generally, rescission contemplates restoration of the parties to as near their former position as possible or practical."  *GMB Enterprises, Inc. v. B-3 Enterprises, Inc.*, 39 Wn. App. 678, 687, 695 P.2d 145 (1985).  Rescission of illegal insurance contracts typically results in the return of all premiums obtained from the sale of the illegal contract.  For example, in *Forrest Currell Lumber Co. v. Thomas*, 464 P.2d 891, 895 (N.M. 1970), the New Mexico Supreme Court required an insurer to return all the premiums obtained by the sale of a void insurance policy.  "To permit appellee Insurance Company to retain the [premiums paid on the void insurance policy] would allow it to gain an advantage by its illegal act.  This we cannot do."  *Id.*; *see also, Thomas v. City of Richmond*, 79 U.S. 349, 356 (1870) (where the parties to an illegal contract are not *in pari delicto,* justice requires that the persons intended to be protected by the law should be able to recover the money or other consideration paid).  Under a recission remedy, class members are entitled to a refund of the monthly payments they made to Aliera/Trinity.

### b. Reformation

The Washington Legislature has provided a reformation remedy under RCW 48.18.510. *Mut. of Enumclaw Ins. Co. v. Myong Suk Day*, 197 Wn. App. 753, 770, 393 P.3d 786, 795 (2017) ("Reformation is an equitable remedy employed to bring a writing that is materially at variance with the parties' agreement into conformity with that agreement.") Reformation typically is accomplished in insurance cases by enjoining a defendant to reform the plan and then reprocess and pay claims consistent with it.  *See Wit v. United Behav. Health*, 317 F.R.D. 106, 141 (N.D. Cal. 2016); *Z.D. v. Group Health*, 2012 U.S. Dist.

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 22 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

149610, *29 (W.D. Wash., October 17, 2012).  Given that both Sharity/Trinity and Aliera are no longer in business, reformation, in a traditional sense, is impossible.

Nonetheless, the Court may conclude that the gross unpaid medical claims submitted by Class members to Aliera for payment reflects the aggregate classwide reformation damages.  This amount is $7,277,428.00.  *See* Luria Decl., ¶10.  This amount is an estimate, since there may be medical claims that were never submitted to Sharity/Aliera such that the estimate is too low; and it is possible that even under a reformed insurance contract, not all of the unpaid medical expenses would be covered, such that the estimate is too high.  *See* Hamburger Decl., ¶16.  Nonetheless, the Court may utilize its discretion to determine classwide reformation damages, even without a precise dollar amount.  *V. C. Edwards Contractor Co. v. Port of Tacoma*, 7 Wn. App. 883, 889, 503 P.2d 1133, 1138 (1972).

## C.   Aliera's Sale of the Healthcare Plans Violated the Washington Consumer Protection Act

Washington's CPA prohibits "unfair or deceptive acts or practices" in any trade, including health coverage.  RCW 19.86.020.  The CPA must be construed "liberally" to benefit consumers.  RCW 19.86.920.  To demonstrate a violation of the CPA, Plaintiffs must show: "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  *Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 316, 472 P.3d 990, 994 (2020).

The Washington Legislature has concluded that violations of Washington insurance law are *per se* violations of the Consumer Protection Act.  RCW 19.86.170 ("[A]ctions or transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020").  "Violations of the regulations applicable to the insurance industry … implicate the public

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 23 [Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

interest and constitute a *per se* violation of the CPA." *Univ. of Wash. v. Gov't Emps. Ins. Co.,* 200 Wn. App. 455, 470 (2017) (brackets in original omitted)**,** *quoting Panag v. Farmers Ins. Co. of Wash.,* 166 Wn.2d 27, 43 (2009); *Indus. Indem. Co. v. Kallevig,* 114 Wn.2d 907, 922, 792 P.2d 520 (1990) ("[T]he Legislature expressly provided that violations of the insurance regulations are subject to the CPA").  Should the Court conclude that Aliera violated Washington insurance law when it sold the Perrins unauthorized health insurance, it must also conclude that Aliera's actions are a *per se* violations of the CPA.  The only remaining factors to prove as causation and injury.  *See Indus. Indem. Co.,* 114 Wn.2d at 923.

Regardless of whether the healthcare plan Aliera sold to Plaintiffs is "insurance," Aliera violated the CPA by representing that medical expenses were "covered" while at the same time skimming the majority of members' payments to itself, leaving Trinity incapable of "covering" those medical expenses. Aliera misrepresented that at most 40% of members' payments may go to administrative costs, when in fact at least 70% was used to cover costs or profits, and at most only 30% of members' payments was actually placed into an account to cover medical expenses.  Luria Decl., ¶11.  The result was that Aliera's aggressive fee structure – negotiated with its handpicked Trinity president – assured that many of the members' medical expenses would never be covered (in addition to Trinity's ultimate demise and bankruptcy). Acts and practices that are falsely designed to make the public think that a product is safe and reliable are unfair and deceptive. *See, e.g., Eifler v. Shurgard Capital Management Corp.,* 71 Wn. App. 684, 696 (1993) (evidence sufficient to support inference of unfair and deceptive practice when storage facility advertised its safety, while not maintaining a safe facility).

Plaintiffs and the proposed class relied upon the representations by Aliera when they purchased the coverage that their plan would be "alternative to" ACA health insurance plans and would pay their medical expenses when needed.  *See* Perrin Decl.,

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 24
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

¶3.  The representations by Aliera induced their injury – the monthly premium payments Aliera received from the Perrins.  *Id.*, ¶3; *see also* Dkt. No. 117, ¶5.  But for Aliera's misrepresentations, Plaintiffs and proposed class members would not have purchased the illegal coverage.

There is no question that Aliera's unfair and deceptive practices affected the public interest.  It sold plans to approximately 3,000 Washington residents.  The amount of unpaid medical claims exceeds $ 7 million.  Luria Decl., ¶10.  The unfair practices were so pervasive that the Washington Insurance Commissioner stepped in to stop the sale of the plans, but not before substantial numbers of Washingtonians, like Plaintiffs, were injured.

The loss of the monthly payments is sufficient to demonstrate injury.  *Panag*, 166 Wn.2d at 57; *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990) (a plaintiff is injured if their "property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.").  Class members paid over $15 million in monthly payments and fees for the sham health coverage sold by Aliera.  All of the elements of a CPA violation are met.

D.     **Remedies**

The damages suffered by Plaintiffs are undisputed.  The class paid a total of $15,425,962.00 in monthly payments to Aliera.  Luria Decl., ¶9.  They are entitled to this amount under a contractual recission remedy.  Additionally, Aliera is liable to the Plaintiff Class for the uncovered medical expenses that would have been covered, had Aliera complied with state insurance laws.  The total gross unpaid medical claims received by Aliera/Trinity for Washington enrollees is $7,277,428.00.  *Id.*, ¶10.  These claims should be considered at their full amount, since Aliera is unrepresented and does not dispute the claims.

Plaintiffs and the proposed class are also entitled to treble damages up to $25,000 per class member pursuant to the CPA, as well as attorney fees and costs to litigate this

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR, IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 25 [Case No. 2:19-cv-01281-BJR]

Sirianni Youtz
Spoonemore Hamburger PLLC
3101 Western Avenue, Suite 350
Seattle, Washington  98121
Tel. (206) 223-0303  Fax (206) 223-0246

dispute.  *See* RCW 19.86.090.   The Court should award treble damages due to the "ongoing course of conduct affecting thousands of consumers both before and after the incidents at issue here." *Matheny v. UnumProvident Corp.*, 594 F. Supp. 2d 1212, 1225 (E.D. Wash. 2009).  The same "strong public interest impact" is present here.  *See id.*

## IV.  CONCLUSION

The Court should expedite its consideration of this motion, and Plaintiffs' Motion for Class Certification with a telephonic hearing.  *See* Motion to Expedite, filed with this Motion.  It should certify the proposed class and, if no counsel appears for Aliera, it should strike Aliera's Answer and enter a default judgment.

If Aliera retains counsel in this matter, the Court should issue a decision on the merits regarding Plaintiffs' Motion for Summary Judgment.  It should conclude that Defendant Aliera designed, marketed, sold and administered illegal and unauthorized health insurance to Plaintiffs and the Class.

The Court should enter a judgment in favor of the Plaintiffs in an amount of $22,703,390.00,  reflecting  $15,425,962.00 in recission damages, and  $7,277,428 in reformation damages.  The Court should also assess CPA treble damages of up to $25,000 per enrollee.  The Court should also direct Plaintiffs' counsel to petition for attorney fees and litigation costs pursuant to RCW 19.86.090 and *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991).

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

1    DATED:  October 26, 2021.

2                                              SIRIANNI YOUTZ
3                                              SPOONEMORE HAMBURGER PLLC

4                                              ___/s/ Eleanor Hamburger_____
                                               Richard E. Spoonemore (WSBA #21833)
5                                              Eleanor Hamburger (WSBA # 26478)
6                                              3101 Western Avenue, Suite 350
                                               Seattle, WA 98121
7                                              Tel. (206) 223-0303; Fax (206) 223-0246
8                                              Email:  rspoonemore@sylaw.com
                                               Email: ehamburger@sylaw.com
9
                                               MYERS & COMPANY, PLLC
10                                             Michael David Myers (WSBA #22486)
11                                             Samantha Lin (WSBA #50782)
                                               1530 Eastlake Avenue East
12                                             Seattle, WA 98102
                                               Tel. (206) 398-1188; Fax (206) 400-1115
13                                             Email:  mmyers@myers-company.com
14                                             Email:  slin@myers-company.com

15                                             MEHRI & SKALET, PLLC
16                                             Jay Angoff, *Pro Hac Vice*
                                               Cyrus Mehri, *Pro Hac Vice*
17                                             1250 Connecticut Avenue, NW, Suite 300
                                               Washington, DC  20036
18                                             Tel. (202) 822-5100
19                                             Email:  jangoff@findjustice.com
                                               Email:  cmehri@findjustice.com
20
                                               *Attorneys for Plaintiffs*
21

22

23

24

25

26

PLAINTIFFS' MOTION TO STRIKE ALIERA'S ANSWER AND
ENTER DEFAULT JUDGMENT AFTER CLASS CERTIF. OR,
IN THE ALTERNATIVE, MOT. FOR SUMMARY JUDG. – 27
[Case No. 2:19-cv-01281-BJR]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

- **Jay Angoff**
  jangoff@findjustice.com
- **Curt Roy Hineline**
  chineline@bakerlaw.com, jmenk@bakerlaw.com, lknox@bakerlaw.com, jbaxter@bakerlaw.com
- **Samantha Lin**
  slin@myers-company.com
- **Cyrus Mehri**
  cmehri@findjustice.com, pleadings@findjustice.com
- **James Raymond Morrison**
  jmorrison@bakerlaw.com, dmadams@bakerlaw.com
- **Michael David Myers**
  mmyers@myers-company.com, tpak@myers-company.com, pclifford@myers-company.com, slin@myers-company.com
- **Richard E. Spoonemore**
  rspoonemore@sylaw.com, matt@sylaw.com, rspoonemore@hotmail.com, stacy@sylaw.com, theresa@sylaw.com

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants, as well as electronically mailed to Katie Goodman:

- **The Aliera Companies Inc.**
  **Aliera Healthcare, Inc.**
  990 Hammond Dr. NE, Suite 700
  Atlanta, GA 30328
- **Assignee for The Aliera Companies, Inc.,** *et al.*
  c/o Katie Goodman
  Asset Recovery Associates Aliera, LLC
  3155 Roswell Road NE, Suite 120
  Atlanta, GA 30305
  kgoodman@gggpartners.com

I hereby certify that I have also electronically mailed the document to the Aliera's former counsel:

- **Robert H. Rutherford,** rrutherf@burr.com
- **Elizabeth B. Shirley,** bshirley@burr.com.

DATED:  October 26, 2021, at Seattle, Washington.

_/s/ Eleanor Hamburger_
Eleanor Hamburger (WSBA # 26478)
Email:  ehamburger@sylaw.com

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON  98121
TEL. (206) 223-0303  FAX (206) 223-0246